[No. H029980. Sixth Dist. Apr. 30, 2008.]

BLICKMAN TURKUS, LP, Plaintiff, Cross-defendant and Appellant, v. MF DOWNTOWN SUNNYVALE, LLC, et al., Defendants, Cross-complainants and Appellants.

862

## COUNSEL

Rossi, Hamerslough, Reischl & Chuck, Ronald R. Rossi and Susan R. Reischl for Plaintiff, Cross-defendant and Appellant.

Keker & Van Nest, Susan J. Harriman, Steven A. Hirsch; Wendel, Rose, Black & Dean, Charles Hansen and Amanda Steiner for Defendants, Cross-complainants and Appellants.

## OPINION

**RUSHING, P. J.**—The primary question in this case is whether a realtor who represented the lessee in a complex commercial lease transaction had a duty to inform the lessor, after the lease was signed but before the lessee took possession, that the lessee's ability to perform the conditions of the lease was jeopardized by its deteriorating financial condition. The trial court held that the lessor had failed to plead facts sufficient to establish any duty on the realtor's part to disclose this information. We find no error in this determination. Nor do we find any error in the trial court's refusal to award attorney fees to the lessor based upon its defeat of the realtor's claims for unpaid commissions. Since these determinations render the realtor's cross-appeal moot, we will dismiss it and affirm the judgment.

### BACKGROUND

Appellant MF Downtown Sunnyvale, LLC, is described in the pleadings as a limited liability company owning certain real property in Sunnyvale. At issue in this action are two buildings, known as buildings 2 and 3, situated on that property. Appellant Mozart Development Co. is described as the agent for MF Downtown Sunnyvale, LLC, for purposes of leasing and managing the property. Both entities are apparently affiliated with John Mozart, who is

not a party to this matter. We will join the parties in referring to appellants collectively as "Mozart."

Mozart alleges in its cross-complaint that in early 1999, it entered into a written commission agreement with Commercial Property Services (CPS) by which it engaged CPS and two affiliated individuals to act as its listing broker and agent in securing a lease of the premises for a specified commission. Inferentially, the buildings had "not yet been constructed or completed," but awaited execution of a lease so that they could be completed or improved to the tenant's specifications. Under the agreement, the first half of the commission would be "due and payable upon full lease execution and the second half . . . upon rent commencement."

In early 2001, Mozart entered into written leases with Handspring, Inc., for buildings 2 and 3. The leases contemplated delivery of the premises in August and September, 2002, with both parties working in the interim to prepare the buildings for occupancy in accordance with Handspring's needs. Their respective rights and obligations in connection with these efforts were set forth in "[w]ork [l]etter[s]" attached to the leases. Under the work letters, Handspring was required to secure its performance by providing letters of credit in the aggregate amount of some $23 million. Additional letters of credit or security deposits may have been required to secure Handspring's obligations under the leases.

Respondent Blickman Turkus, LP, doing business as BT Commercial Real Estate (BTC), through its agent Tom Snider, represented Handspring in the lease transaction. BTC later contended that it was the "procuring agent" entitled to a commission under the commission agreement between Mozart and CPS. Mozart acknowledged this assertion in its cross-complaint, and while denying it, also adopted it hypothetically as a basis for recovery against BTC should it be sustained by the court. (See pt. I.G., *post.*)

Mozart alleged that from October 2001 through "at least" July 2002, Snider and BTC were "advised by Handspring that [it] was having financial difficulties," that "its projected growth was not as fast as [it] had originally thought," and that it was "considering possible exit strategies" from the leased buildings, including a negotiated termination of the leases and reducing Handspring's financial risk. Mozart alleged that it did not learn of these matters until mid-August, 2002, when another agent contacted it to negotiate a termination of the leases. Mozart alleged that as a result of the delay in its learning of these matters, it sustained damage. (See pt. I.D., *post.*) Mozart and Handspring eventually negotiated a termination of the leases.

This action was commenced on January 28, 2003, not by Mozart, but by BTC, which filed a complaint against Mozart and Handspring in which it

alleged that, as the procuring agent in the lease transaction, it was a third party beneficiary of Mozart's commission agreement with BTC and thus entitled to the commission there specified. It alleged that Mozart had paid the first half of the commission as called for in the agreement, but had refused to pay the second half. As eventually amended, the complaint asserted claims for breach of the commission agreement by Mozart, breach of the covenant of good faith and fair dealing, breach by both Mozart and Handspring of an "implied promise to complete the lease transactions," and tortious interference by Handspring with BTC's economically advantageous relationship with Mozart.

Mozart successfully attacked BTC's complaint by motions for summary adjudication and judgment on the pleadings. BTC successfully demurred to Mozart's cross-complaint, with the court ultimately dismissing the third amended cross-complaint without leave to amend. The court entered a judgment by which neither party took anything. Mozart moved to vacate the judgment and for an award of attorney fees incurred by it in opposing BTC's complaint. The court denied both motions.

Mozart filed a notice of appeal from the judgment of dismissal on its cross-complaint. BTC filed a cross-appeal from (1) the summary adjudication of its claims, and (2) an order denying sanctions under Code of Civil Procedure section 128.5. Mozart filed a separate notice of appeal from the order denying its motion to vacate the dismissal of its cross-complaint and the order denying its motion for attorney fees.

DISCUSSION

I. *Dismissal of Cross-action*

A. *Standard of Review*

"On appeal from a judgment of dismissal following the sustaining of a demurrer without leave to amend, the appellant 'has the burden to show either [that] the demurrer was sustained erroneously or that to sustain the demurrer without leave to amend constitutes an abuse of discretion.' [Citation.]" (*Smith v. County of Kern* (1993) 20 Cal.App.4th 1826, 1829–1830 [25 Cal.Rptr.2d 716] (*Smith*).) Because a general demurrer raises only a pure question of law—whether the facts set forth in the challenged pleading are sufficient to constitute a cause of action—a reviewing court considers it without deference to the trial court. (*Leko v. Cornerstone Bldg. Inspection Service* (2001) 86 Cal.App.4th 1109, 1114 [103 Cal.Rptr.2d 858] (*Leko*); see Code Civ. Proc., § 430.10, subd. (e).) In doing so it examines the allegations of the challenged pleading, as supplemented by matters of which judicial notice is taken. (*Leko, supra,* 86 Cal.App.4th at p. 1114.) The court must

accept as true all well-pleaded allegations of material fact, "but not contentions or conclusions of fact or law." (*Berry v. City of Santa Barbara* (1995) 40 Cal.App.4th 1075, 1082 [47 Cal.Rptr.2d 661].)

With respect to the second question—the trial court's failure to grant leave to amend—a reviewing court must defer to the trial court's ruling unless the appellant demonstrates "a manifest abuse of discretion." (*Smith, supra,* 20 Cal.App.4th at p. 1830.) "Ordinarily it is an abuse of discretion to sustain a general demurrer to a complaint without leave to amend if there is a reasonable possibility [that] the defect in the complaint can be cured by amendment." (*Ibid.*)

### B. *Duty to Disclose*

■ The gist of Mozart's claim is that for a period of some 10 months, BTC wrongfully failed to disclose information—Handspring's precarious financial condition—knowledge of which would have enabled Mozart to avoid some of the injury it allegedly suffered when Handspring finally approached it to negotiate a termination of the leases. A central issue, as the parties seem to recognize, is whether it appears from the facts alleged in the cross-complaint that BTC was, during those 10 months, under any duty to disclose those facts to Mozart. It goes without saying that no one can be liable in tort for causing injury to another unless he, or someone whose conduct is attributed to him, was legally obligated to act differently. Liability cannot arise from silence unless the law commands the defendant to speak.

A duty to speak may arise in four ways: it may be directly imposed by statute or other prescriptive law; it may be voluntarily assumed by contractual undertaking; it may arise as an incident of a relationship between the defendant and the plaintiff; and it may arise as a result of other conduct by the defendant that makes it wrongful for him to remain silent.

Here, Mozart points to no statute obligating BTC to warn it of Handspring's weakened financial condition. As for a contractual duty to disclose, Mozart has alleged a number of evidentiary facts apparently intended to show that BTC expressly or impliedly assumed certain ongoing contractual obligations in connection with the lease transaction. However it does not allege that these obligations included any specific obligation to warn or advise *Mozart.* The cross-complaint may be understood to allege—if only inferentially—that BTC was under a continuing obligation of an arguably contractual nature to inform its "client" of matters relevant to a transaction.[1] But with one

---

[1] The cross-complaint is a model of improper pleading. Instead of alleging the ultimate fact of a particular custom and usage among real estate agents in the relevant community, the pleading contains several paragraphs summarizing deposition testimony and other evidence

qualification discussed below (see pt. I.G., *post*), there is no hint that Mozart was, or ever viewed itself as, BTC's "client." Indeed, the cross-complaint does not assert any contractual relationship between Mozart and BTC. It cannot be understood to posit a contractual duty to disclose.

This leaves us with the possibilities that a duty to disclose arose from a relationship between Mozart and BTC, or from conduct by BTC obligating it to speak. Mozart contends that BTC owed such a duty (1) as the agent for Handspring; (2) hypothetically, as an agent for Mozart itself; or (3) by virtue of statements by BTC that obligated it to speak when they ceased to be correct.

### C. *Concealment: Elements*

Mozart's first cause of action asserts "concealment" against Snider and BTC in that they (1) breached a duty of full and fair disclosure they owed to Mozart as the real estate agents for Handspring; and (2) made representations at the time of Mozart's entry into the lease agreement that obligated them to speak when they learned that Handspring might be unable to perform that agreement. As reflected in the immediately preceding discussion, these are two quite distinct legal theories, which we will address separately. (See pts. I.E., I.F., *post*.) First, however, we will review general principles governing the tort of concealment.

Concealment is a species of fraud or deceit. (See Civ. Code, §§ 1710, subd. 3, 1572, subd. 3; *Lovejoy v. AT&T Corp.* (2004) 119 Cal.App.4th 151, 158 [14 Cal.Rptr.3d 117] (*Lovejoy*).) "[T]he elements of an action for fraud and deceit based on concealment are: (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." (*Marketing West, Inc. v. Sanyo Fisher (USA) Corp.* (1992) 6 Cal.App.4th 603, 612–613 [7 Cal.Rptr.2d 859]; see *Lovejoy, supra,* 119 Cal.App.4th at pp. 157–158.)

The parties have focused their attention almost exclusively on the second element, i.e., whether Mozart has alleged facts from which a duty to disclose

---

apparently intended to establish this fact. A complaint (or cross-complaint) is supposed to consist of "(1) [a] statement of the facts *constituting the cause of action,* in *ordinary and concise language,*" and "(2) [a] demand for judgment . . . ." (Code Civ. Proc., § 425.10, subd. (a), italics added.) A pleading is no place to quote, paraphrase, or even allude to the testimony of witnesses.

would arise. They also devote considerable attention to the question whether such duty, assuming it arose at the time of the lease execution, persisted thereafter so as to require the disclosures whose absence forms the basis for the claim. Before reaching those questions, however, we must note the deficiencies attending Mozart's attempt to plead several other elements of the tort.

### D. *Fraudulent Intent, Causation, Damage*

As noted above, liability for concealment requires that the defendant have "suppressed the fact with the intent to defraud the plaintiff." (*Marketing West, Inc. v. Sanyo Fisher (USA) Corp., supra,* 6 Cal.App.4th at p. 613.) It must also appear, as with any other tort, that the defendant's wrongful conduct was a legal or proximate cause of harm to the plaintiff. These are two distinct elements. It is not enough that the misstatement (or concealment) actually harmed the plaintiff; it must have been made by the defendant with the intent to *induce action* (or inaction) by the plaintiff. Similarly, an intent to deceive the plaintiff is legally meaningless unless the deception caused injury.

In the context of fraud by affirmative false statements, the mental element is commonly stated in terms of intent to induce *"reliance."* (E.g., *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638 [49 Cal.Rptr.2d 377, 909 P.2d 981], italics added.) In the context of fraud by concealment, the more precise formula is probably intent to *induce conduct*—action or inaction—that differs from what the plaintiff would have done if informed of the concealed fact. (See *Southern Cal. etc. Assemblies of God v. Shepherd of Hills etc. Church* (1978) 77 Cal.App.3d 951, 959, fn. 5 [144 Cal.Rptr. 46] (*Assemblies of God*) [fraud causes of action appeared "imperfectly pleaded" where "plaintiff never alleges in so many words that defendants' statements were made for the purpose of inducing the sale"].)

Here the only attribution of intention to BTC and Snider, for purposes of Mozart's first cause of action, appears as follows: "The aforementioned conduct of BTC and Snider was an *intentional concealment* of material facts known to them with the *intention on their part of procuring a commission without fulfilling their duties and obligations,* as a real estate broker and salesperson, to advise Cross-complainants of all material facts regarding Handspring and all knowledge they had regarding Handspring which was despicable conduct that subjected Cross-complainants to cruel and unjust hardship in conscious disregard of their rights so as to justify an award of punitive damages." This allegation fails to assert that cross-defendants intended to *induce action or inaction* on the part of cross-complainants. For that reason alone, no cause of action for concealment is stated.

The quoted allegation suffers from other infirmities, including its failure to satisfactorily convey that any omission by cross-defendants in fact induced cross-complainants to engage in conduct differing from that in which they would otherwise have engaged. Typically a claim of this type rests on the straightforward premise that the defendant's concealment of facts led the plaintiff to enter into a transaction he would not otherwise have entered, or on terms he would not have accepted; or to forego an opportunity he would otherwise have taken. The pleading here does not suggest that BTC fraudulently induced Mozart to *enter into* the leases with Handspring. Mozart plainly and explicitly bases its claims on conduct and events occurring *after* the execution of those leases.

Mozart does make an attempt to allege that it was induced to forego more profitable opportunities, but it affirmatively appears from the cross-complaint that Mozart was not in a position to pursue these opportunities. Thus Mozart alleges, "Cross-complainants are informed and believe and thereon allege that if they had learned of the true facts in October, 2001, that they could have mitigated damages at that time and re-leased Buildings 2 and 3 at a time when commercial rents were higher than they were when the Termination Agreement was executed in January 2002, and at a time when they are higher than they are in the present market." But as the cross-complaint affirmatively alleges, Mozart had already leased the premises to Handspring. It could not have "re-leased" the buildings so long as it remained bound by its leases with Handspring. Nothing in the cross-complaint suggests that it could have unilaterally freed itself from those obligations. Nor can it be supposed that Handspring would have consented to or acquiesced in such conduct at any time before the parties actually negotiated their voluntary termination of the leases. Mozart affirmatively alleges that as late as July 2002—about a month before Handspring approached Mozart about negotiating a termination— Handspring was still hoping to *sublease* all or part of the subject buildings, or at any rate was believed by Snider to be so.[2] So long as that remained true, it is far from apparent—and far from likely—that knowledge of Handspring's financial situation could have made any difference to Mozart.

Nor does it appear that Mozart had any "damages" to "mitigate" unless and until Handspring failed or refused to perform its obligations under the lease. Indeed, given Mozart's eventual agreement to terminate the leases, it appears highly doubtful—and the cross-complaint cannot be understood to adequately allege—that the posited concealment proximately caused any injury to

---

[2] Mozart alleges, "Through July, 2002, Handspring's representatives continued to tell Snider and BT[C] that Handspring's growth was not as projected. Snider contacted at least one other real estate broker advising that *there was a strong possibility Handspring would have both Buildings 2 and 3 available for sublease.*" It is also alleged that at least as late as May 2002, Handspring was still communicating with an architect and forwarding at least some of those communications to BTC.

Mozart. Again Mozart's allegations are perplexing: "As a direct and proximate result of the concealments of Cross-defendants BT[C] and Snider, as previously set forth, Cross-complainants have been damaged in *the amount of the commission already paid to BT[C]* by the listing broker in the transaction, Commercial Property Services, in the approximate amount of $850,873.22. Additionally, Handspring never commenced the payment of rent for Buildings 2 and 3 and terminated its Leases with Cross-complainants. Despite diligent efforts by Cross-complainants to lease said buildings they have been unable to lease a majority of the space. As a result, they have been damaged due to the conduct of BT[C] and/or Snider in the amount of the *loss of the rent they could have obtained* and *other payments to be made by Handspring* pursuant to said Leases in the excess of $100 million." We fail to see how any plausible causal connection could ever be established between allegedly tortious nondisclosures beginning in October 2001, and a payment of commissions apparently occurring some eight months earlier. It is even more difficult to see how the concealment alleged in the cross-complaint could have caused Mozart to lose rent payments by Handspring under the lease. If Handspring had been otherwise able to perform its obligations under the lease, no conduct attributed to BTC by Mozart could have reduced that capability. Instead of holding Handspring to those obligations, however, Mozart renegotiated their relationship, apparently receiving very considerable sums of money in the process.[3] But even if that had not occurred, neither the cross-complaint nor anything else in this record supports the notion that earlier knowledge of Handspring's finances could have somehow preserved the original lease arrangement. The allegations of damage, causation, inducement, and fraudulent intent are all woefully deficient.

These deficiencies, however, did not form a basis for BTC's challenge to the cross-complaint, and are not cited by it in defending the judgment on appeal. This raises at least the theoretical possibility that Mozart might have been able to cure these allegations by further amendment. Therefore, rather than predicate affirmance on these defects, we will turn to the question to which the parties devote most of their attention: whether the facts alleged in the cross-complaint placed cross-defendants under a duty to disclose.

---

[3] In opposition to Mozart's motion for summary adjudication, BTC offered evidence that the renegotiated transaction permitted Mozart to draw both letters of credit as well as a letter of credit on a third building, plus receive cash, notes, and stock, for a total value well in excess of $50 million, plus improvements paid for by Handspring. Mozart objected to this evidence as irrelevant, but did not dispute its accuracy. We do not rely on it in assessing the sufficiency of the cross-complaint, but we do take notice of it in considering whether the court abused its discretion by denying leave to amend.

E. *Duty of Buyer's Agent to Disclose to Seller*

As noted, Mozart's first cause of action appears to predicate a duty to disclose on two distinct theories. The first is set forth as follows: "At all times, *as a real estate agent representing Handspring*, Snider owed a duty to be truthful and honest and disclose material facts to Cross-complainants as he has admitted at his deposition in this action."[4] (Italics added.) The legal premise for this theory, as nearly as we can discern, appears in the statement in Mozart's brief that every real estate licensee has a "fundamental duty . . . to deal honestly and fairly with **all** parties in the transaction, not just his or her own principal. (*Earp v. Nobmann* (1981) 122 Cal.App.3d 270 [175 Cal.Rptr. 767]; *Norman I. Krug Real Estate Investments, Inc. v. Praszker* (1990) 220 Cal.App.3d 35, 42–43 [269 Cal.Rptr. 228]; *Hale v. Wolfsen* (1969) 276 Cal.App.2d 285 [81 Cal.Rptr. 23]; *Lingsch v. Savage* (1963) 213 Cal.App.2d 729, 735 [29 Cal.Rptr. 201].)"

None of these cases sustains Mozart's claim that BTC owed it a duty to disclose changes in Handspring's financial condition arising after the parties executed the lease. In *Earp v. Nobmann, supra,* 122 Cal.App.3d 270 *(Earp)*, disapproved on another point in *Silberg v. Anderson* (1990) 50 Cal.3d 205, 219 [266 Cal.Rptr. 638, 786 P.2d 365], a broker who acted as the go-between in an attempted real estate purchase performed his professional duties so poorly that the seller denied the existence of a contract and tried to sell the property to another, while the buyer insisted that a contract was formed, sued the seller for specific performance, and thus thwarted the subsequent sale. (See *Earp, supra,* 122 Cal.App.3d at p. 280.) In the seller's cross-action, the broker was held to have acted negligently toward the *seller* in numerous respects, including his failure to inform the *buyer* that the offer presented on the buyer's behalf did not satisfy the basic criteria originally put forward by the seller. (*Id.* at p. 291.) The court did not characterize this as concealment or the breach of any duty to disclose; indeed, it never used the terms "disclose," "conceal," "suppress," "fraud," or "deceit." Nor did the court find it necessary to determine the nature of the relationship between the broker and the two parties. (See *id.* at p. 290.) Rather the court viewed the broker's deficient communications with the buyer as but one instance of the "negligent behavior" the court found "pervasive." (*Id.* at p. 291.) As relevant here, the broker's liability was predicated on negligence. (*Id.* at pp. 276, 277–278, 281, 289–290.) The case has no apparent bearing here beyond the general proposition that a broker may be liable to those foreseeably injured by his negligence. We will discuss the applicability of that concept to this case in part I.I., *post.* For present

---

[4] As we have previously observed, the inclusion in a pleading of evidentiary matter, such as the concluding phrase in the quoted sentence, is improper. On the other hand, where it does not contradict more competent allegations, we will simply disregard it as superfluous.

purposes it is enough to conclude that *Earp* provides no authority for holding that a buyer's (or lessee's) agent has any duty of disclosure, as such, toward a seller (or lessor).

In *Norman I. Krug Real Estate Investments, Inc. v. Praszker, supra*, 220 Cal.App.3d 35, 40 (*Krug*), the seller of an apartment building told his realtor about an unrecorded deed of trust he had given to a creditor. The realtor thereafter sold the building without advising the creditor of the sale, or the buyer of the encumbrance. (*Ibid.*) The creditor sued the realtor for wrongfully causing the extinguishment of his security interest. The matter "proceeded to trial on a number of theories," but the trial court "rendered judgment for [the creditor] strictly on negligence grounds." (*Ibid.*) On appeal the realtor denied that he owed any duty to the creditor, noting the absence of privity or a special relationship between them. (*Id.* at pp. 41–42.) While the court's analysis of this issue is germane to Mozart's general negligence theory (see pt. I.I., *post*), the decision is irrelevant to any duty of disclosure owed by a buyer/lessee's realtor to a seller/lessor.

In *Hale v. Wolfsen, supra*, 276 Cal.App.2d 285, a realtor cooperating with the sellers' agent sued for a commission after the sellers withdrew from a purchase agreement upon discovering that the plaintiff realtor had fraudulently misrepresented the condition and value of a property to be conveyed to them under the agreement. (See *id.* at p. 291.) Not surprisingly, the trial court ruled that the realtor's misrepresentations vitiated the sellers' obligations not only to perform the purchase agreement but also to pay a commission to the realtor. The court also found that the realtor "was a subagent of [the sellers] and owed them a duty of utmost good faith, which she breached by failing to ascertain all of the pertinent facts about the [exchange] property and by making statements and representations to them that she did not know were true." (*Id.* at pp. 289–290.) On appeal the realtor unsuccessfully attacked the latter finding (*id.* at pp. 290–291) and the finding that she had breached her fiduciary duties to the sellers (*id.* at pp. 291–292). Mozart apparently cites the case for its passing dictum that "real estate brokers are under a duty to deal fairly with all parties, and be well informed on current market conditions." (*Id.* at p. 292.) Again, the case has no tendency to show the existence of any particular duty of disclosure on the part of a buyer/lessee's agent toward a seller/lessor.

In *Lingsch v. Savage, supra*, 213 Cal.App.2d 729, 732–733 (*Lingsch*), the trial court sustained a demurrer by the sellers' broker to a complaint by buyers who alleged that the defendants had sold them a building without disclosing, among other things, that the building had been condemned. The broker contended that no cause of action was stated because the form purchase agreement recited that the property was purchased as is and that no

extrinsic representations had been made. (*Id.* at p. 734.) The reviewing court narrowed the issue to whether the buyers could state a claim based upon "mere nondisclosure . . . occurring between parties not in a confidential relationship." (*Ibid.*) The court then cited the judicially developed rule that "where the seller knows of facts materially affecting the value or desirability of the property which are known or accessible only to him and also knows that such facts are not known to, or within the reach of the diligent attention and observation of, the buyer, the seller is under a duty to disclose them to the buyer." (*Id.* at p. 735.) "Failure of the seller to fulfill such duty of disclosure constitutes actual fraud." (*Id.* at p. 736.) It then noted that a similar duty rests upon the seller's agent: "Where such agent or broker possesses, along with the seller, the requisite knowledge according to the foregoing decisions, whether he acquires it from, or independently of, his principal, he is under the same duty of disclosure. He is a party connected with the fraud and if no disclosure is made at all to the buyer by the other parties to the transaction, such agent or broker becomes jointly and severally liable with the seller for the full amount of the damages." (*Ibid.*) The court held that the complaint did not sufficiently state a cause of action under this theory, but could probably be amended to do so. (*Id.* at pp. 739–740.)

■ Of the four cases cited by Mozart, *Lingsch* is the only one imposing a duty of disclosure, as such, on one who was not the plaintiff's agent at the time of the alleged concealment. The holding there rested on a duty peculiarly imposed upon the *seller's* agent to disclose inobvious facts affecting the *value of the property*. The case was later cited for the proposition that "where a real estate broker or agent, *representing the seller*, knows facts materially affecting *the value or the desirability of property offered for sale* and these facts are known or accessible only to him and his principal, and the broker or agent also knows that these facts are not known to or within the reach of the diligent attention and observation of the buyer, the broker or agent is under a duty to disclose these facts to the buyer." (*Cooper v. Jevne* (1976) 56 Cal.App.3d 860, 866 [128 Cal.Rptr. 724] (*Cooper*), citing *Lingsch, supra*, 213 Cal.App.2d at pp. 735–736, italics added.) This "*Cooper-Lingsch* rule" was later held to implicitly obligate the agent for a *residential seller* to disclose "reasonably discoverable defects" to the buyer, and to "conduct a reasonable investigation" to that end. (*Easton v. Strassburger* (1984) 152 Cal.App.3d 90, 99, 100 [199 Cal.Rptr. 383]; see *id.* at p. 102 ["affirmative duty to conduct a reasonably competent and diligent inspection" and to disclose facts affecting value to buyer].) This holding was ultimately codified in Civil Code section 2079, subdivision (a), which declares that a broker who is engaged by a seller, or who acts in cooperation with a broker engaged by a seller, has a duty "to a prospective purchaser of residential real property . . . to conduct a reasonably competent and diligent visual inspection of the property offered

for sale and to disclose to that prospective purchaser all facts materially affecting the value or desirability of the property that an investigation would reveal . . . ."

Here the duty imposed by these authorities never came into existence because (1) Mozart was a seller (lessor), not a buyer; (2) BTC represented a buyer, not a seller; (3) the transaction involved commercial, not residential, property; and (4) the matter allegedly concealed went not to the value of the property, or even the desirability of the transaction, but to facts learned by the broker after the transaction had been consummated, at least to the extent of executing an agreement binding on the parties.

■ Nor do we see any reason to extend the duty described above to the situation before us. As the *Easton* court observed, the primary purposes of burdening a seller's broker with disclosure duties running to the buyer are "to protect the buyer from the unethical broker and seller and to insure that the buyer is provided sufficient accurate information to make an informed decision whether to purchase." (*Easton v. Strassburger, supra,* 152 Cal.App.3d at p. 99.) The duty is justified not only by the broker's likely superior knowledge of facts affecting the value of the property, but by the risk that the residential purchaser will suppose the broker to be adequately representing his interests. Thus the court observed that "in residential sales transactions the seller's broker is most frequently the best situated to obtain and provide the most reliable information on the property *and is ordinarily counted on to do so.*" (*Id.* at p. 100, italics added.) " 'The real estate broker's relationship to the buyer is such that the buyer usually expects the broker to protect his interests.' " (*Ibid.,* quoting Comment, *A Reexamination of the Real Estate Broker-Buyer-Seller Relationship* (1972) 18 Wayne L.Rev. 1343, 1343; see *Easton, supra,* 152 Cal.App.3d. at p. 101, fn. omitted ["Not only do many buyers in fact *justifiably* believe the seller's broker is also protecting their interest in securing and acting upon accurate information and rely upon him, but the injury occasioned by such reliance, if it be misplaced, may well be substantial"]; *id.* at p. 101, fn. 5, quoting Sinclair, *The Duty of the Broker to Purchasers and Prospective Purchasers of Real Property in Illinois* (1981) 69 Ill.Bar.J. 260, 263–264 [" 'In the typical residential real estate transaction . . . , the buyer, in particular, may be intentionally or inadvertently led . . . to believe the broker will represent his interest even where he is aware the broker has a listing agreement with the seller. Since the broker's commission is generally paid as a percentage of the sales price, the broker's interest is more closely identified with that of the seller than of the buyer. Where the buyer is unappreciative of the potentially divided loyalty of the broker, he may be lulled into relying on the broker to his significant detriment. Misplaced reliance by the buyer can extend beyond the issue of price to questions regarding quality of title, condition of the premises, and proration of closing costs, property taxes, recording fees, and other expenses.' "].)

Indeed the *Easton* court expressed doubt that any such duty should be imposed in commercial transactions, writing, "Unlike the residential home buyer who is often unrepresented by a broker, or is effectively unrepresented because of the problems of dual agency [citations], a purchaser of commercial real estate is likely to be more experienced and sophisticated in his dealings in real estate and is usually represented by an agent who *represents only the buyer's interests.* [Citation.]" (*Id.* at p. 102, fn. 8, italics added.)

Here there is no allegation that Mozart was ever led to believe, or did believe, or rationally could have believed, that BTC was representing its interests. On the contrary, recognition pervades the cross-complaint that each party in the transaction was represented by its own agent—Mozart by CPS, Handspring by BTC. Thus Mozart affirmatively alleged that Snider and BTC *represented Handspring*, not Mozart, in the lease transaction, i.e., Snider was BTC's "authorized agent *representing Handspring* in the transaction," and that he made statements to Mozart "on Handspring's behalf, and as a representative of BT[C]." Mozart further alleged that it shared the understanding with CPS that the latter would "continue to *act on* [*Mozart's*] *behalf*, with respect to any leases to be executed, until such time as the duties and obligations of [Mozart] and any tenant were fulfilled;" that BTC similarly understood that it would "continue to *represent* [*its*] client until such time as the building(s) is/are finished, tenant improvements complete, and rent is to commence;" that Mozart expected and intended CPS, and any cooperating broker or procuring agent, to "continue to *represent their respective clients* after the Leases were executed, until such time as rent commenced;" and that CPS and BTC understood as between themselves "that they would continue to represent their respective clients until rent commenced . . . ."

Nor does Mozart allege any conflict of interest tempting BTC to perniciously favor Handspring's interests over Mozart's. If anything, both stood to lose from a termination of the lease agreement—Mozart would lose its expectation of rents and other payments called for by that agreement, while BTC would lose the second half of its commission, or at least a clear claim to that sum. Nowhere does the cross-complaint suggest any facts comparable to the natural alignment between broker and *seller* arising from the correlation between sales price and commission.

The record suggests no basis for any expectation by Mozart that BTC would disclose matters regarding Handspring other than as its "respective client[]," Handspring, might direct. The only factor in common with *Easton* is BTC's presumably superior knowledge of its client's financial condition. But so far as this record indicates, BTC had that knowledge only by virtue of its confidential relationship with Handspring. Mozart alleges that beginning in late 2001 and continuing to mid-2002, "Snider and BT[C] were advised

by Handspring" of various matters, including "that Handspring was having financial difficulties and that its projected growth was not as fast as Handspring had originally thought." If the possession of superior knowledge so gained were enough to trigger a duty to disclose, every agent of any kind could be required to disclose information obtained in confidence from his principal so long as it appeared potentially germane to the interests of another party to a proposed transaction. This would of course make it impossible for any principal to conduct negotiations through an intermediary without disclosing every fact that might improve the bargaining position of the other party. Nothing known to us would justify such a revolution in the law governing business transactions.

■ In sum, none of the cases cited by Mozart, and no other authority known to us, supports the imposition of a duty on a lessee's agent in a commercial real estate transaction to disclose to the lessor information, acquired after execution of a lease, concerning the lessee's finances. Mozart has offered no reason to impose such a duty. We therefore decline to do so. Insofar as Mozart's cross-complaint rested upon such a duty, it failed to state facts sufficient to constitute a cause of action.

### F. Duty Arising from Prior Statements

■ A duty to disclose can arise from the making of affirmative representations with knowledge of undisclosed facts that " 'materially qualify the facts disclosed, or . . . render [the disclosed facts] likely to mislead . . . .' " (*Linear Technology Corp. v. Applied Materials, Inc.* (2007) 152 Cal.App.4th 115, 132 [61 Cal.Rptr.3d 221] (*Linear Technology*), quoting *Warner Constr. Corp. v. City of Los Angeles* (1970) 2 Cal.3d 285, 294 [85 Cal.Rptr. 444, 466 P.2d 996].)

Mozart seeks to invoke this theory, but the allegation on which this attempt rests does not supply an adequate foundation for it: "Prior to Handspring's entering into the Leases for Buildings 2 and 3, Snider, on Handspring's behalf, and as a representative of BT[C], had made affirmative representations to Cross-complainants *regarding Handspring's ability to pay the rent into the future*. At all times, as a result, he not only had a duty to disclose all material facts known to him as a real estate agent, but also a duty to correct any information which, if previously true, had become false or had changed. These duties continued as long as Snider and BT[C] continued to act as agent and broker in the transaction, including following execution of the Leases." (Italics added.) This allegation, and the cross-complaint as a whole, fail to identify any statement that was rendered false or inaccurate, then or later, by any failure of disclosure. Instead the pleading is pregnant with potentially fatal ambiguity. It asserts that Snider made unspecified statements on an identified *topic*—"Handspring's ability to pay rent in the future."

■ Concealment is a species of fraud, and "[f]raud must be pleaded with specificity." (*Linear Technology, supra*, 152 Cal.App.4th at p. 132.) To plead tort liability based on false or incomplete statements, the pleader must set forth at least the *substance* of those statements. Mozart can hardly claim not to know what statements were made to it. We can conceive of no excuse for its failure to plead them "with specificity."

Indeed, Mozart seems to have *retreated* from the comparative specificity of an earlier version of the cross-complaint, which was itself challenged for vagueness. In its original cross-complaint Mozart alleged, "After February 18, 1999, and prior to February 14, 2001, cross-defendants' authorized agent, Thomas Snyder [*sic*], represented to John Mozart, either directly or through representations to Mozart's real estate agents . . . that Handspring was fully qualified as a tenant, financially stable, creditworthy, and otherwise willing and financially able to meet its obligations under the Leases . . . ." In its demurrer to this pleading, BTC attacked the quoted allegation as unduly vague. Mozart reiterated the allegation in its first amended cross-complaint. In demurring to that pleading, BTC did not renew its attack on this particular allegation, perhaps because, as stated in its supporting memorandum, counsel for Mozart had "recently advised BT[C] that they will be <u>dropping</u> their claims against BT[C] for fraud and negligent misrepresentation, as well as their claims for rescission based on fraud and concealment . . . ." In Mozart's second amended cross-complaint, the allegation appeared in its present form, i.e., Snider "made representations to cross-complainants regarding Handspring's financial and other qualifications as a tenant." In demurring to this pleading, BTC apparently overlooked this allegation, stating that "BT[C] and Snider are not alleged to have spoken at all to Mozart," and therefore "cannot be liable for active concealment." Similarly, in demurring to the third amended cross-complaint, BTC stated that it "cannot be liable for active concealment" because it was "not alleged to have had any communication at all with Mozart . . . ."

BTC's failure to acknowledge the quoted allegation cannot blind us to Mozart's conduct in the face of the original vagueness objection: After apparently expressing an intent to abandon the claim altogether, Mozart reasserted it in a far more nebulous form than the original. Whatever the history of this theory, the cross-complaint in its present form utterly fails to plead any affirmative representation on which a duty to disclose might be predicated.

Mozart does not directly assert otherwise. Instead it treats the pleading *as if* it contained such an allegation, nesting the relevant assertion within an assertion on some other point, perhaps to avoid a direct misstatement of the record. Thus Mozart writes that cross-defendants "knew their assurance that

Handspring was a ready, willing and able tenant had changed." But no such assurance is alleged. Later they write, "BT[C] and Snider had a duty to *correct their representation* that Handspring was ready, willing and able to enter into the Leases when they discovered that information was no longer true." (Italics added.) But the only allegation of such a representation was abandoned two cross-complaints ago. In the closest thing to a direct assertion on this point, the concept of an affirmative statement suddenly gives way to something quite different: "BT[C] and Snider deliberately and systematically concealed from Mozart that *the tenant they had* procured and *presented as a 'ready, willing and able' lessee* was actively working, with BT[C]'s assistance, to make sure that it was none of these things." (Italics added.) There is of course as much difference between "presenting" and "representing" as there is between "moving" and "removing," "porting" and "reporting," or "pressing" and "repressing." A would-be singer's agent who sends his client to an audition might be said to "present" her as an able musician, but if the impresario concludes otherwise the agent's conduct hardly constitutes fraud.

Nor do we see any evidence that Mozart could truthfully plead an affirmative representation by BTC if given yet another chance (their fifth) to do so. The centrality of the point to their theory of recovery can hardly be doubted. They refer to the concept of a "ready, willing and able" tenant at least 11 times in their opening brief. Yet nowhere do they flatly allege any representations by BTC, or for that matter Handspring itself, concerning the latter's financial condition, present or future. We may suppose that in a transaction of this magnitude some kind of financial data was provided to the lessor. But we must also suppose that Mozart was satisfied with those data, and indeed finds no fault with them now, since it has apparently never suggested that its *entry into the leases* was procured by fraud. Its apparent inability to attribute an affirmative representation to BTC is reflected in such constructions as its reference to the concealment of information that "contradicted the *basic notion* that Handspring was a ready, willing and able tenant." (Italics added.) It offers no authority for a theory of fraud by "basic notion." And like much of Mozart's presentation below and here, this statement seeks to blur the distinction between two critically different points of time: the point when the leases were executed, at which time all parties apparently believed Handspring was ready, willing, and able to perform; and the time beginning eight months later, when that supposition became clouded by doubt. The question is not what "basic notion" might have been shared by the participants at an earlier time, but whether Mozart has alleged facts sufficient to impose a duty of disclosure on BTC at the later time alleged in the cross-complaint. Insofar as Mozart seeks to predicate such a duty on statements initially made by BTC, the failure to actually plead such statements. dooms its theory to failure.

Once again, however, the parties seem to have overlooked these rudimentary deficiencies in favor of more debatable issues—in this instance, whether Mozart's theory, if adequately pled, is viable as a matter of substantive law. The question then becomes whether, supposing BTC had affirmatively assured Mozart of Handspring's financial ability to perform its obligations, BTC would thereby become obligated to notify Mozart when, following execution of the lease, Handspring betrayed doubts about its ability to perform. We do not believe that any existing authority would impose a duty on BTC to, in Mozart's words, "correct" this information under the circumstances alleged by Mozart.[5] Certainly none of the authorities cited by it requires, or in our view justifies, the imposition of liability here.

In *Assemblies of God, supra,* 77 Cal.App.3d 951, the representatives of a church, in selling real estate to another church, told the buyer that a driveway across an adjoining parcel would remain available for the buyer's use, and that such availability was required by city planners. However, when the local planning commission conditioned a related approval on the continuance of a driveway easement, the seller's representatives successfully objected, and the easement was extinguished. The buyer acknowledged being aware of the commission proceedings but denied knowledge that the initial ruling had been protested or scheduled for rehearing. The reviewing court reversed a summary judgment for the seller, holding that its failure to disclose its efforts to eliminate the easement breached the covenant of good faith and fair dealing. (*Id.* at p. 956.) The court observed that "knowledge of what was going on would have provided [the buyer] with a clear basis for rescinding its contract to buy parcel 2 and prevented whatever damage [it] can prove as arising from the fact that the purchase agreement became executed four full years before [it] became aware of any problem." (*Ibid.*) The seller denied any duty to disclose, but the court found a triable issue of fact "with respect to the existence of a confidential relationship" between the parties. (*Ibid.*) The court noted allegations that none of the buyer's representatives were "experienced in real estate dealings" and that they "placed complete confidence" in the seller's representatives, who included "an experienced real estate broker . . . ." (*Ibid.*) The buyer also insisted that it had viewed the selling church as " 'a recognized and established Christian church organization worthy of trust and belief and represented by persons of integrity.' " (*Ibid.*) Given the presence of a triable issue concerning the nature of the parties' relationship, it was immaterial whether the cause of action were viewed as sounding in contract or in tort, i.e., fraud. (*Id.* at p. 957.)

---

[5] The weaknesses in a party's position are often betrayed by infelicities in its exposition. Thus Mozart asserts that BTC was under a "duty to correct material facts that had changed." "[F]acts," properly understood, can neither change nor be corrected. We suspect that what Mozart would like to have said, and yet could not say, is that BTC was under a duty to correct *statements* rendered untrue by later events.

The situation here differs from that in *Assemblies of God* in at least four material respects. First, the defendant there gave affirmative assurances and then acted affirmatively to alter the subject matter of those assurances. Second, the direct and voluntary contractual relationship between the parties generated a duty of good faith and fair dealing that made the defendant's *conduct* (not its mere failure to disclose) potentially tortious. Third, the plaintiff presented evidence to suggest that it reasonably vested trust and confidence in the defendant to deal with it squarely. Finally, it was apparent that a timely disclosure would have permitted the plaintiff to protect itself. Here, even if Mozart were to allege that BTC made affirmative assurances to it, there is no suggestion that BTC did anything to cause the failure of those assurances. Nor does Mozart allege any contractual relationship between the parties; rather, it alleges that BTC had contractual relationships with Mozart's agent, as well as with Handspring, whose interests it represented. Third, there is no hint of any special trust placed by Mozart in BTC, or of any factual basis for such trust. Nor is there any coherent suggestion that earlier disclosure would have done Mozart any good, since it had already bound itself to the leases with Handspring when the occasion for disclosure allegedly arose.

In *Koch v. Williams* (1961) 193 Cal.App.2d 537 [14 Cal.Rptr. 429] (*Koch*), two couples who purchased subdivision homes sued the developer over a drainage easement that he granted to the local government *while the properties were in escrow*. As relevant here, the opinion states, "One who learns that his statements, even if thought to be true when made, have become false through a change in circumstances, has the duty *before his statements are acted on* to disclose the new conditions to the party relying on his original representations." (*Id.* at p. 541, italics added.) This rule applied there because the effect of the nondisclosure was to deprive the plaintiffs of "the opportunity to reject the proposal or sale of the property under these conditions." (*Ibid.*) Thus, "[h]ad [the buyers] known of [the sellers'] act in the placing of record an easement across the properties in dispute, they might have elected to rescind the escrow and purchase agreement which clearly indicated the property was not subject to such an easement." (*Id.* at p. 542.) Here there is no suggestion that BTC should or could have made clarifying disclosures at a time when Mozart might yet "reject the proposal" or unilaterally rescind the lease agreement. Once that agreement was signed, whatever damage might be done was—so far as the cross-complaint shows—done. Mozart's vague suggestion that post-execution disclosure might have permitted it to "mitigate" its supposed injuries in some unspecified manner hardly brings the case within the rationale of *Koch*.

Similar divergences preclude application here of *Kretzschmar v. Janss Investment Co.* (1932) 126 Cal.App. 698 [14 P.2d 1069]. There the plaintiff buyers secured an option to purchase a lot from the defendant sellers. Two

months later the sellers dedicated a strip of land crossing the lot to the county flood district. The next day the buyers and sellers entered into a formal purchase agreement. Some two years later, flood control authorities constructed a storm drain that bisected the lot with a 100-foot wide fenced ditch. Noting that the map reflecting the easement had been recorded "but a few hours before this contract was [signed]," the court observed, "It would seem that in common justice . . . appellants should have at this time by some act on their part directed respondents' attention to the material change that had been made in the lot by the dedication of this easement. . . . The property covered by the option did materially change in character and appellants had knowledge of this change, but failed to call it to the attention of respondents and so *deprived them of the right to withdraw from the purchase.* . . . [Citation.] The instant case differs from those cases where a deed is given as the closing incident of a purchase of land and constitutes an expression of the terms of the agreement reached in the transaction by the parties. Here the contract, in so far as an agreement of the parties upon the subject matter had been reached, was evidenced by the option made some months before the contract of sale was delivered. The respondents were justified in relying upon this option and a duty rested upon the appellants to inform them of any material changes in the subject matter which had taken place subsequent to the option." (*Id.* at pp. 702–703, italics added.) Here there was nothing comparable to the unilateral right conferred under an option to forego the contemplated transaction. Instead Mozart was already bound by the lease when BTC first learned of the facts on whose nondisclosure Mozart's claim depends.

In *Dyke v. Zaiser* (1947) 80 Cal.App.2d 639 [182 P.2d 344], the lessee of an amusement center brought an action to rescind the lease after the center was essentially closed by the police. The trial court found that the lessor had made certain representations about the income from the premises; that these statements were intended and understood to mean "that there existed no reason known to said defendant why the business should not continue to operate profitably in the future"; that the lessee was induced by these statements to enter into the lease; and that the statements were "false and fraudulent in that defendant knew that said representations were untrue and knew that law enforcement officers of the County of San Diego contemplated and intended, within a period of twenty-four hours after the execution of said lease, to compel the closing of a substantial portion of the business . . . ." (*Id.* at p. 644.) Among the lessor's contentions on appeal was that the lessee had failed to prove that the lessor knew of the impending police action at the time the parties *orally agreed* on the lease, as distinct from the time of its formal execution several days later. (*Id.* at p. 648.) In rejecting this contention, the court observed that, at the time of execution, the lessee "was [still] relying upon [the lessor's] representations, and that . . . incidents had transpired rendering the representations no longer true. [The lessor] knew that

conditions had changed which materially affected the desirability of the property and he knew that [the lessee] was unaware of the changed conditions. Under these circumstances, his silence, together with the other circumstances related, would constitute fraud." (*Id.* at p. 654.) Despite the parties' having reached an oral understanding as to terms, the lessor knew that if the lessee were informed of the impending police action, he "would not execute the lease at all." (*Ibid.*)

In *Black v. Shearson, Hammill & Co.* (1968) 266 Cal.App.2d 362 [72 Cal.Rptr. 157], a stock brokerage house and its senior partner were held liable to certain customers to whom they sold stock in a corporation in which the partner was also a director. The sales had been induced by glowing reports of the corporation's prospects when, as known to the partner, internal communications described its situation as " 'drastic.' " (*Id.* at p. 365.) On appeal the defendants argued that the evidence failed to show that the partner knew any statement by him was false *when made*. (*Id.* at p. 367.) The court rejected this premise, but went on to declare that even if it had not, scienter would be adequately established by his having "permitted [the statements] to stand after he learned the truth *and before respondents relied on them*." (*Ibid.*, italics added.)

In all of these cases (1) a seller made affirmative representations concerning the condition or value of property; (2) the seller knew of (in three cases he actively brought about) changed circumstances that rendered his representations deceptive; (3) the seller was aware of the changed circumstances at a time when the buyer could have declined to complete the purchase; (4) other circumstances justified the buyer's reliance on the seller to correct the misimpression it had created; and (5) the seller remained silent, thereby depriving the buyer of the opportunity to forego the purchase. Comparing these factors to the present case reveals the incoherence of Mozart's "duty to correct" theory. Mozart stands in the position of a seller, not a buyer, and the representations had nothing to do with the value of the property. More essentially, the harm for which Mozart seeks compensation is *not* its *entry into* the lease with Handspring, but its failure to *withdraw* from that agreement some time after executing it. As we have said, this assumes the undemonstrated and highly doubtful proposition that Mozart *could* have withdrawn from that agreement in any manner other than the one it ultimately chose: a mutual agreement with the other contracting party. It may be theoretically conceivable that the supposed delay in disclosure caused it some injury. But this is nowhere competently alleged and, more to the immediate point, none of the cited decisions rests a duty to disclose on such a slender reed.

Mozart fails to plead a cause of action on a theory of affirmative statements giving rise to a duty to disclose. Because it also fails to adequately allege a

duty of disclosure arising from BTC's status as Handspring's agent, the trial court did not err by sustaining the demurrer to Mozart's first cause of action without leave to amend.

### G. *Hypothetical Allegation of Dual Agency*

■ Mozart's second cause of action rests on the hypothesis that although BTC primarily represented Handspring in the lease transaction, it was also a procuring or cooperating agent and thus *an agent of Mozart's*, bound as such to disclose to Mozart all facts known to BTC that might be relevant to Mozart's dealings with Handspring. This theory presents analytical challenges not because such an allegation is inherently difficult; on the contrary, realtors often find themselves in an "dual agency" relationship whereby they represent, and thus owe fiduciary duties to, both the seller and the buyer. (See 2 Miller & Starr, Cal. Real Estate (3d ed. 2000) § 3.12, pp. 64–69.) The difficulty arises from the contingent and hypothetical nature of Mozart's claim of the agency, coupled with circumstances indicating that the contingency cannot now occur.

In its cross-complaint Mozart does not simply allege, even in the alternative, that BTC was in fact its agent. This may reflect the flat denial of such a relationship in Mozart's answer to BTC's complaint.[6] Rather than contradict this denial in its cross-complaint, Mozart there alleges that BTC has *claimed* to be a procuring or cooperating agent, and then hypothesizes that *if the court were to sustain* this claim, it would follow that BTC owed Mozart, as its principal, a duty of disclosure.[7] This hypothetical mode of pleading presents ample difficulties of its own, but the plot is thickened still further by the fact that the trial court has dismissed BTC's claims against Mozart, thus seemingly placing beyond possibility of realization the hypothesis on which the second cause of action rests, i.e., that BTC might be found to be Mozart's agent. However, BTC has cross-appealed from the dismissal of its complaint. Were we to reverse that ruling, reinstating BTC's claims, the possibility

---

[6] In its third amended complaint, BTC alleged that it was entitled to a commission under Mozart's agreement with Commercial Property Services Company because that agreement expressly contemplated payment of a commission to the "procuring agent," and BTC was the "procuring agent" in that it "procured Handspring as a tenant for two of the office buildings . . . ." Although the present record appears not to contain an answer to this pleading, it does contain Mozart's answer to its predecessor, in which Mozart flatly denies identical allegations.

[7] The pivotal allegation of the second cause of action is the following: "BT[C] and Snider contend that they were procuring or cooperating agents in the transaction which led to the two Lease Agreements with Handspring. If in fact the Court should find them to be a procuring or cooperating agent then it is Cross-complainants contention that throughout the transaction and until such time as rent was to commence under the Commission Agreement, BT[C] and Snider were representing Cross-complainants as their fiduciaries and owed fiduciary duties to Cross-complainants of the highest standard of care."

would again arise that BTC might be found a procuring or cooperating agent, thereby restoring to the realm of possibility the hypothesis on which Mozart's second cause of action depends. This would seem to invite us to decide BTC's cross-appeal before attempting to assess the viability of Mozart's second cause of action. But this presents a conundrum, because BTC has designated its cross-appeal "conditional," urging us to "consider" the same "*only* if [we are] inclined to grant some aspect of Mozart's appeal . . . ." (Original italics.)

The parties thus seem intent on thrusting us into a rather dizzying paradox. Mozart asserts a cause of action that depends on BTC's successful pursuit of at least a part of its claims; but those claims stand adjudicated adversely to BTC, and thus to Mozart's hypothesized cause of action; but that adjudication is exposed to reversal by BTC's cross-appeal; but BTC asks us to contemplate such a disposition only if we find some part of Mozart's appeal meritorious. The upshot of this logical merry-go-round seems to be that in order to trigger the condition on which the second cause of action depends—or more precisely, to leave the door open for that condition to be triggered—we would have to first find that some part of Mozart's appeal is meritorious, and then sustain BTC's cross-appeal (or enough of it that a finding of agency would again be possible).

This reasoning apparently precludes us from relying on the posited impossibility of the condition as a basis to affirm the judgment on the cross-complaint. We must therefore conduct a closer examination of the allegations of the second cause of action. Confined to their literal meaning and logical effect, they certainly do not set out the *factual* foundation for a cause of action. In essence they say that if the court makes a particular finding, Mozart will make a particular argument. Such a statement may be appropriate in a trial brief, but it is ineffectual in pleading a cause of action because it asserts no *facts* that would subject the defendant to liability. At its core it expresses nothing more than the pleader's intent to assert a particular *theory* under specified conditions. That is hardly the same thing as stating a claim.

The more difficult question is whether this deficiency is such that Mozart could not have cured it by amendment. BTC pointed out the deficiency in the trial court, though on different terms. It quoted the above allegation and wrote, "That is not an allegation of fact; it is a mere legal conclusion." However, instead of analyzing its sufficiency in terms of the law of pleading, BTC went off on the *substantive soundness* of the proposition that a procuring or cooperating agent is the subagent of the listing agent with a fiduciary duty to the seller. BTC correctly observed that such a relationship does not necessarily arise, and that the payment of compensation, or an agreement to pay, is not necessarily determinative of the existence of an

agency relationship or the fiduciary duties attending it. (See Civ. Code, § 2079.19; 2 Miller & Starr, Cal. Real Estate, *supra*, §§ 3.5, 3:10, pp. 22, 44.)

■ But an allegation of agency is deemed an allegation of ultimate fact. (*Skopp v. Weaver* (1976) 16 Cal.3d 432, 437, 439 [128 Cal.Rptr. 19, 546 P.2d 307].) BTC acknowledged this rule below but implied that it was inapplicable because "where the essential facts are not contested, the question whether an agency relationship existed may be decided as a matter of law." This is a rule applicable to the assessment of *evidence*, not to determining the sufficiency of a *pleading*. In the latter context, the existence of an agency relationship *is* the "essential fact[]," and where alleged must be accepted as true. (See *id.* at pp. 436–437.) BTC also asserted that Mozart "has not alleged the requisite agency relationship between itself and BT/Snider, but has instead alleged that its agent was CPS, while BT/Snider represented Handspring. Those facts do not show an agency relationship between BT/Snider and Mozart—much to the contrary." This assertion rests on the premise that one cannot "represent" one party in a real estate transaction and still be an agent for the other party. If that were true this case would be very easy indeed. But it is not true. (See 2 Miller & Starr, Cal. Real Estate, *supra*, § 3.12, pp. 64–69.)

■ Thus if the cross-complaint *unequivocally alleged* that BTC acted as the agent of Mozart, we would have no difficulty in holding this an adequate pleading of such a relationship. Instead, however, Mozart has elsewhere denied any such relationship, and alleges in the cross-complaint only that if the court finds such a relationship to have existed, despite Mozart's denial, then Mozart will contend that a duty of disclosure arose. This is, so far as we know, a novel mode of pleading. But it does not necessarily follow that it is improper. In substance, Mozart attempted to plead that BTC claims to have been a procuring or cooperating agent; that Mozart denies the existence of such a relationship; that if it did exist, then BTC was Mozart's agent and fiduciary; that BTC thus owed Mozart a duty of disclosure; and that BTC breached that duty by failing to inform Mozart of Handspring's financial difficulties. Although we know of no precedent for hypothetical pleading of precisely this type, it resembles the pleading of mutually inconsistent bases of liability or defense, which the law permits so long as the differing grounds are separately stated and free of self-contradiction. (See *Steiner v. Rowley* (1950) 35 Cal.2d 713, 718–719 [221 P.2d 9].) Tolerance for such pleading rests on the principle that uncertainty as to factual details or their legal significance should not force a pleader to gamble on a single formulation of his claim if the facts ultimately found by the court, though diverging from those the pleader might have considered most likely, still entitle him to relief.

The same rationale applies here: Mozart denies that BTC ever became its agent, but acknowledges BTC's contrary assertion, and asserts that if this

claim is borne out, then BTC was Mozart's agent and fiduciary. In principle we see no reason to bar Mozart from pleading such a claim. For purposes of our analysis, therefore—and in light of BTC's failure to challenge the cross-complaint on the precise ground we have noted—we will assume that the cross-complaint can be amended to plead such a theory, such that if the pleading is otherwise sufficient, the trial court erred by denying leave to amend.

## H. *Duty of Agent with Conflicting Obligations*

We have already noted several dubieties in Mozart's claims that it suffered compensable harm as a result of BTC's failure to disclose Handspring's financial condition. In particular we have observed that the cross-complaint affords no basis to suppose that an earlier disclosure of those matters would in fact have spared Mozart the harm, if any, it ultimately sustained. So long as Mozart remained bound by the lease, Handspring was entitled to explore, as it did, alternative means of extricating itself from the financial burdens imposed by the lease. Earlier notice might have enabled Mozart to threaten and bluster; it might have placed it in a different bargaining position in a renegotiation of the parties' relationship; but the premise that Mozart could actually establish these or any other liability-producing hypotheses of causation and damage is not supported by anything alleged in the cross-complaint or otherwise brought to our attention.

BTC, however, has not objected to the pleading on this ground. Rather, its chief contention is that, assuming its role as procuring agent engendered an agency relationship between it and Mozart, that relationship terminated upon the presentation of a qualified buyer. This argument delineates a chief subject of contention between the parties. The cross-complaint contains page after page of allegations intended to support the conclusion that BTC's role in the transaction was understood by all parties to continue beyond the execution of the lease at least until construction reached the agreed stage at which Handspring would commence the payment of rent.

In our view this issue is largely, if not entirely, beside the point. BTC's argument conflates the duration of an agency *relationship* with the persistence of the *duties* arising from such a relationship. While an agent's duty of disclosure *ordinarily* ends upon termination of the agency relationship, this is by no means automatic; the agent may remain under such a duty "when it is foreseeable to the agent that the principal will continue to rely on the agent for information and the agent does not inform the principal that no further information will be provided." (Rest.3d Agency, § 8.11, com. c., p. 376) "For example, if an agent arranges a transaction on behalf of a principal that is ongoing at the time their agency relationship ends, it may be

foreseeable to the agent that the former principal will continue to rely on the agent to provide information relevant to the ongoing transaction." (*Ibid.*) Here Mozart has alleged precisely such a situation, and if it has neglected to allege foreseeable continued reliance by it, the defect could presumably be cured by amendment.

The second cause of action fails, however, for a clearer reason: it rests on the erroneous supposition that if BTC were Mozart's agent, then BTC was obligated ipso facto to disclose information to Mozart. This is incorrect. It appears from the face of the cross-complaint that the information in question was acquired by BTC in confidence from Handspring. It is also alleged unequivocally that whatever BTC's relationship to Mozart, it was an agent of, and to, Handspring. Therefore disclosure of Handspring's confidential information to Mozart, without Handspring's consent, would unquestionably have constituted a breach of BTC's fiduciary duties to Handspring. (See Rest.3d Agency, § 8.05(2).)[8]

Mozart's second cause of action erroneously supposes that BTC was obliged to disclose Handspring's confidential information to it even if doing so would violate BTC's duties to Handspring. In fact BTC's duty in such a situation would be to withdraw from one, and perhaps both, agency relationships. (See Rest.3d Agency, § 8.03, com. b, illus. 3.)[9] It might be supposed that BTC's failure to withdraw could itself form the basis of a cause of action, but we are unable to conceive of an adequate allegation of damage and causation. BTC's posited withdrawal from the posited agency relationship with Mozart would have had no discernible effect, since so far as this record shows BTC was neither actively representing Mozart in any transaction nor providing it with any sort of counseling or similar services. Conceivably BTC would also have been obligated to withdraw from its relationship with Handspring, though this proposition appears difficult if not impossible to substantiate. Even accepting it, we are again at a loss to see how BTC's

---

[8] "An agent has a duty [¶] . . . [¶] (2) not to use or communicate confidential information of the principal for the agent's own purposes or those of a third party." (Rest.3d Agency, § 8.05.)

[9] The Restatement describes a hypothetical situation in which a sales agent might be obligated to disclose to his employer that a new product relevant to the employer's business was being developed by a corporation in which the agent owned an interest. The comment states in part, "It is, of course, possible that an agent may assume an adverse position in which the agent may not legally discharge the duties of disclosure that the agent owes to the principal because the agent owes a duty to another person not to disclose a fact that §§ 8.06 and 8.11 require be disclosed to the principal. In [the described hypothetical situation], for example, [the agent's] duties to [his] [c]orporation may prohibit [his] disclosure of new product developments to [its] customer, [his employer]. Unless it is possible for [his corporation] to shield [him] from access to facts that [he] will have a duty to disclose to [his employer], [the agent's] position is not tenable, and consequently [*he*] *must withdraw as* [*his employer's*] *agent.*" (Rest.3d Agency, § 8.03, com. b, illus. 3, p. 294, italics added.)

withdrawal would have averted any harm otherwise suffered by Mozart. Handspring would presumably have engaged others to provide the services BTC was providing. Mozart might well learn of the termination of that relationship, but for all it would necessarily know, BTC and Handspring might simply have had a falling out.

For all these reasons we agree with the trial court that the second cause of action fails to state facts sufficient to constitute a cause of action. Nor can we say that the court abused its discretion in denying leave to further amend that cause of action.

## I. *Negligence*

Mozart's third cause of action seeks to predicate liability on the breach of several duties apparently not claimed to arise from any principal-agent relationship. Although the cause of action is entitled "Negligence Against Cross-Defendants BT Commercial and Thomas Snider," the quoted allegations do not confine themselves to a generalized duty of care but also assert duties of diligence, honesty, good faith and fair dealing, and investigation and disclosure.[10] No reliance is placed on these latter allegations, however, and so far as we can discern they add nothing to the allegations elsewhere in the cross-complaint. We will therefore confine ourselves to the question whether Mozart alleged facts sufficient to establish negligence, i.e., a breach of a general duty of due care, by BTC.

Again our task is complicated by the fact that the parties do not join battle over the basic question whether the elements of the cause of action are adequately set forth in the pleading but choose instead to debate questions we consider secondary, if not peripheral. This problem seems to originate, once again, with BTC's misreading of the cross-complaint. In its demurrer, BTC characterized the third cause of action as resting on its allegedly having "concealed" information "negligently" rather than "intentionally." BTC went

---

[10] Mozart alleges: "57. Cross-defendant BT[C], as a real estate broker acting for Handspring, had a duty to Cross-complainants to diligently exercise skill and care in the performance of its duties and a duty of honesty, fair dealing and good faith, and to investigate and disclose all facts known to them [*sic*] materially affecting the value or desirability of the Lease transactions to Cross-complainants. Such duties continued until such time as rent was to commence under the Commission Agreement as set forth above. [¶] 58. Said Cross-defendant had a duty, among other things, to disclose the fact that Handspring's financial condition had changed, that it had discovered subsequent information about the status of Handspring's financial condition and its ability to perform under the long term Leases, Handspring was considering terminating the Leases or taking other action as previously set forth, and the other facts learned by Snider in or about October, 2001 through July, 2002 as previously set forth." Mozart goes on to refer of "[t]he breaches" of these duties without detailing them. Presumably, it here relies upon its incorporated earlier allegations.

on to argue that this was a distinction without legal significance, and that the court should sustain the demurrer because the third cause of action "mirrors [the] first cause of action for concealment and is duplicative." This is not a ground on which a demurrer may be sustained. (See Code Civ. Proc., § 430.10.) A quarter-century ago the code authorized a *motion to strike* "irrelevant and *redundant*" matter from a pleading. (Code Civ. Proc., former § 453, italics added, repealed 1982.) But the parallel provision now empowers the court only to "[s]trike out any irrelevant, false, or improper matter inserted in any pleading." (Code Civ. Proc., § 436, subd. (a).) The elimination of the reference to redundancy may have rested on the irreproachable rationale that it is a waste of time and judicial resources to entertain a motion challenging part of a pleading on the sole ground of repetitiveness. (See Civ. Code, § 3537 ["Superfluity does not vitiate"].) This is the sort of defect that, if it justifies any judicial intervention at all, is ordinarily dealt with most economically at trial, or on a dispositive motion such as summary judgment.

BTC also challenged the third cause of action on the ground that BTC owed no duty to Mozart at the time of its alleged breach "because the leases had been executed when the alleged breach occurred." But once the premise is accepted that the cross-complaint alleges an arguably negligent omission, it seems highly doubtful that the duty on which such allegation depends can be categorically declared to have been extinguished or terminated by Mozart's execution of the lease. If it was foreseeable that Mozart could be harmed by the posited nondisclosure, and the facts are otherwise conceded to support a claim for negligence, it is difficult to see how we could categorically conclude that BTC and Snider ceased to owe Mozart a duty of care merely because Mozart had signed a contract with another party.

 Again, however, it seems to us that the cross-complaint suffers from far more fundamental defects. The essence of negligence is carelessness or inadvertence. (See *Solv-All v. Superior Court* (2005) 131 Cal.App.4th 1003, 1010 [32 Cal.Rptr.3d 202] [" 'negligence' implies a careless, but unintentional, failure to act with due care"]; *Davis v. Hearst* (1911) 160 Cal. 143, 172 [116 P. 530] ["Negligence necessarily implies an absence of intent or purpose," or is at least independent of either]; *Chetwood v. California Nat. Bank* (1896) 113 Cal. 414, 422 [45 P. 704] [allegation that defendant bankers allowed cashier to run bank so as to render it insolvent charged conduct "not . . . committed inadvertently or carelessly, which would amount to negligence pure and simple, but to have been wrought against the corporation through contrivance and collusion, with a design to injure it—a charge which establishes that the pleader must have considered that he was dealing with a case of willful tort, partaking of the nature of a fraud"].)

The cross-complaint alleges no conduct that appears, or is alleged to be, careless or inadvertent. There is no suggestion that BTC forgot to disclose the

subject information to Mozart, or tried but failed to do so, or supposed that someone else had done so, or supposed that Mozart had no interest in the information. Such an allegation could scarcely be taken seriously since Mozart alleges with painful prolixity that BTC closely communicated with Handspring over some nine or 10 months about its anticipated difficulties in performing its obligations under the lease. The premise that BTC *neglected* to inform Mozart of these facts, as distinct from choosing to so behave, seems highly implausible to say the least. In any event it is not alleged.

Nor do the facts alleged resemble those on which courts have imposed liability for negligence in comparable situations. In *Earp, supra,* 122 Cal.App.3d 270, the court pervasively referred to the defendant broker's conduct as negligent. (See *id.* at pp. 277–278, 276 ["negligence as a real estate broker"], 281 [trial court's finding of negligence], 289 ["breach of an oral contract and . . . negligence"], 290 ["negligent interference with prospective economic advantage"].) But the gist of that case was a kind of realtor malpractice. As most pertinent here, it involved not the withholding of information but a series of incompetent judgments about what to communicate, how, and to whom. Most pertinently, the defendant neglected to tell the buyer that his offer did not meet the minimum conditions the seller had said he was willing to accept. The defendant compounded this error by encouraging the buyer to stand on a nonexistent contract. Nothing like this is alleged in Mozart's cross-complaint.

█ The case most nearly supportive of Mozart's attempt to state a negligence cause of action is *Krug, supra,* 220 Cal.App.3d 35, 40, where a realtor was held liable to the holder of an unrecorded deed of trust for causing its extinguishment in the course of a sale of the encumbered property. The court noted that a realtor is under a "fundamental duty" to "deal honestly and fairly with all parties in the sale transaction." (*Id.* at p. 42.) It then noted that defining the reach of that duty in a given case depends on "weighing a number of factors, including the extent the transaction was intended to affect the third party, the foreseeability of harm, the degree of certainty the third party suffered injury, the moral blame attached to the broker's conduct, and the policy of preventing future harm." (*Id.* at p. 42.) It noted that the imposition of a duty to disclose an unrecorded security interest was "supported by standards already existing in the industry." (*Ibid.*) It then observed, "The most important step in determining if a broker owes a duty of care to a third party is to examine 'whether a reasonable person would have foreseen an unreasonable risk of harm to the third person and whether in view of such risk the broker exercised ordinary care under the circumstances.' [Citation.]" (*Id.* at pp. 42–43.) The imposition of a duty of care on the realtor there was justified because, among other things, he knew or should have known that there was a significant risk that the plaintiff's security would be destroyed if the sale went through without its disclosure to the buyer. (*Id.* at p. 43.)

Here only one of the factors identified in *Krug* appears from Mozart's cross-complaint: it was certain that the "transaction" in question—whether viewed as the lease itself, or Handspring's contemplated withdrawal from it—would *affect* Mozart. However, it was far from certain or foreseeable that *BTC's silence* would *harm* Mozart. As we have already observed, Mozart failed to coherently allege that it *was* harmed by BTC's conduct. In the absence of a sound allegation to that effect, it is impossible to say whether any harm was foreseeable. Nor do the facts alleged instill confidence that this deficiency might be cured through amendment. Certainly it was foreseeable that Mozart would be harmed if Handspring defaulted on the lease. But this is not what occurred, or was contemplated, and had it been otherwise there is no basis to suppose that any disclosure to Mozart by BTC could have prevented it. BTC was evidently enlisted by Handspring to assist in finding a way out of the lease with minimal damage. The pleadings offer no basis to suppose that BTC could expect Mozart to be harmed more by Handspring's quietly exploring its options and developing a strategy for terminating the lease than it would have been if BTC had, in breach of its clear fiduciary obligations to Handspring (see pt. I.H., *ante*), notified Mozart prematurely of Handspring's efforts. The cross-complaint fails to allege facts establishing a breach by BTC of a general duty of due care.

### J. *Negligent Supervision*

In its fourth cause of action, Mozart alleges that BTC negligently supervised Snider, its agent, by "allowing him to commit fraud and conceal the facts previously set forth from Cross-complainants including but not limited to his knowledge of facts which became available to him after the leases were signed including his knowledge of Handspring's financial condition, financial stability, and ability to honor the Lease agreements and abide by their terms; his knowledge that Handspring was considering either subleasing the buildings and/or terminating their leases; his knowledge that Handspring was interviewing brokers to negotiate a termination, and all of the information within his possession, custody and control from October, 2001 through July, 2002, previously set forth." We have already concluded that the fraud on which this cause of action rests is not adequately alleged. This cause of action therefore necessarily fails as well.

In sum, the trial court did not err by sustaining the demurrer to Mozart's third amended cross-complaint or by doing so without leave to amend.

## II. *Denial of Attorney Fees*

### A. *Background*

Around January 19, 2006, after the trial court granted summary adjudication against BTC on the remaining causes of action of its complaint, Mozart

filed a cost bill claiming some $496,000 in attorney fees "pursuant to separate motion to be filed." On February 6, BTC filed a motion to tax costs, challenging the fee claim on the grounds that (1) in view of its failure to secure any relief under its cross-complaint, Mozart was not a prevailing party entitled to a fee award; and (2) Mozart had no contractual or statutory right to fees from BTC, because BTC was not a party to the underlying contract and would not itself have been entitled to fees had it prevailed on its complaint.

On March 8, 2006, Mozart brought a motion seeking some $398,000 in fees it claimed to have incurred in defeating BTC's complaint. The motion rested on the following points: (1) BTC's complaint was founded upon the commission agreement between Mozart and its broker, CPS. (2) The agreement contained a clause providing for recovery of attorney fees by the prevailing party in "any litigation between the parties hereto to enforce any provision of this Agreement." (3) Although BTC was not a party to the agreement, it claimed to be a third party beneficiary entitled to enforce its terms, and it prayed in its complaint for attorney fees under the quoted clause. (4) BTC would thus have been entitled to fees had it prevailed upon its complaint. (5) Since Mozart prevailed instead, it was entitled to fees pursuant to Civil Code section 1717 (section 1717) and Code of Civil Procedure section 1021.[11]

BTC opposed the motion on two grounds: (1) Mozart was not "the party prevailing on the contract" for purposes of section 1717(a), because Mozart failed to obtain any relief on its cross-complaint, which was also an "action on [the] contract" for purposes of that statute. (2) Mozart had no right to recover against a nonparty to the commission agreement unless that party would itself have been entitled to fees had it prevailed; and had BTC prevailed on its complaint, it would not have been entitled to fees because the commission agreement did not manifest an intent to extend the right to fees to third parties.

Mozart met BTC's first point by arguing that its claims were not "on the contract" and that BTC had "admit[ted]" as much by failing to move for attorney fees as the prevailing party on Mozart's cross-complaint. On the

---

[11] Civil Code section 1717, subdivision (a) (section 1717(a)), provides in part: "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs."

Code of Civil Procedure section 1021 provides, "Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties; but parties to actions or proceedings are entitled to their costs, as hereinafter provided."

second point Mozart asserted that the case on which BTC primarily depended was "a factual aberration" that diverged from paramount authority, and that BTC's position was incompatible with the allegations of its own complaint and its responses to discovery.

The trial court denied the motion for fees and granted the motion to tax them from the cost bill.

### B. *Party Prevailing on the Contract*

A request for an award of attorney fees is largely entrusted to the discretion of the trial court, whose ruling "will not be overturned in the absence of a manifest abuse of discretion, a prejudicial error of law, or necessary findings not supported by substantial evidence. [Citations.]" (*Yield Dynamics, Inc. v. Tea Systems Corp.* (2007) 154 Cal.App.4th 547, 577 [66 Cal.Rptr.3d 1].) The trial court exercises a particularly "wide discretion" in determining who, if anyone, is the prevailing party for purposes of section 1717(a). (*Sears v. Baccaglio* (1998) 60 Cal.App.4th 1136, 1158 [70 Cal.Rptr.2d 769], quoting *Nasser v. Superior Court* (1984) 156 Cal.App.3d 52, 59 [202 Cal.Rptr. 552].) To overturn that determination on appeal, the objecting party must demonstrate "a clear abuse of discretion." (*Sears v. Baccaglio, supra,* 60 Cal.App.4th at p. 1158.) However, the "determination of the legal basis for an award of attorney fees" is a "question of law" which the reviewing court will examine de novo. (*Sessions Payroll Management, Inc. v. Noble Construction Co.* (2000) 84 Cal.App.4th 671, 677 [101 Cal.Rptr.2d 127] (*Sessions*).)

As framed by the parties, the dispositive question is whether the cross-complaint was an action "on a contract," i.e., the commission agreement containing the fee clause. Thus Mozart asserts that its claims in the cross-complaint "did not arise out of the Commission Agreement but instead out of a real estate agent's duties as a matter of law." As so framed, we have no difficulty in resolving this issue in favor of the trial court's finding that the cross-action was "on [the] contract," such that each party prevailed on the other's "action on a contract" and neither prevailed on the matter as a whole.

▆▆ ". . . California courts liberally construe the term ' " 'on a contract' " ' as used within section 1717. [Citation.] As long as the action 'involve[s]' a contract it is ' "on [the] contract" ' within the meaning of section 1717. [Citations.]" (*Dell Merk, Inc. v. Franzia* (2005) 132 Cal.App.4th 443, 455 [33 Cal.Rptr.3d 694]; see *Hastings v. Matlock* (1985) 171 Cal.App.3d 826, 841 [217 Cal.Rptr. 856], quoting *Care Constr., Inc. v. Century Convalescent Centers, Inc.* (1976) 54 Cal.App.3d 701, 706 [126 Cal.Rptr. 761] [" 'as long as the action here involved a contract it was "on a contract" and within Civil Code, section 1717' "].)

Mozart's cross-complaint refers to the contract containing the fee clause—the "Commission Agreement"—no fewer than 14 times. It attaches a copy of the agreement and incorporates it by reference. It relies heavily on the language of the agreement to establish that when Handspring's financial troubles first appeared, the agency relationships contemplated by the agreement were still in existence. Thus Mozart alleged, "The Commission Agreement further provided that the first half of the commission would be due and payable upon full Lease execution and *the second half due and payable upon rent Commencement.*" It noted BTC's claim to a commission under the agreement as a "cooperating . . . or procuring agent." As we have noted, Mozart relied, and indeed continues to rely, on that claim—albeit conditionally—to assert that BTC became *Mozart's* agent. (See pt. I.G., *ante.*) Moreover the prayer of the cross-complaint included a demand for Mozart's attorney fees, an item of relief for which no colorable basis other than the commission agreement appears. Given these facts we detect no error in the implied determination that Mozart's cross-action was "on [the] contract" for purposes of section 1717(a).

Mozart asserts that BTC's failure to seek fees on its own behalf after securing the dismissal of Mozart's cross-complaint was a tacit concession that "the Cross-Complaint did not arise out of the Commission Agreement and that [BTC] was not entitled to any attorney's fees based thereon." But BTC never had an opportunity to *pray* for fees in a pleading, because having successfully demurred to the cross-complaint, it never submitted a pleading in which such a prayer might have been allowed. As for BTC's failure to seek fees by motion, the sequence of relevant events strongly suggests, and the trial court could certainly find, that such failure reflected not a disbelief by BTC in its *potential right* to fees, but a well-justified belief that the trial court would not find it to be a prevailing party entitled to them.

■ On June 28, 2005, the court eliminated BTC's first cause of action, for breach of the commission agreement, by summary adjudication. Once that occurred it should have been obvious that the trial court was not likely to designate BTC the prevailing party on the contract. It was only on July 14, 2005—some two weeks *after* disposing of BTC's contract claim—that the court formally disposed of Mozart's cross-complaint by sustaining BTC's demurrer. Under section 1717(a), attorney fees "shall be an element of the costs of the suit." Costs are to be claimed after entry of judgment or dismissal. (See Cal. Rules of Court, rule 3.1700(a)(1).) More specifically, attorney fees are to be sought by noticed motion "served and filed within the time for filing a notice of appeal . . . ." (Cal. Rules of Court, rule 3.1702(b)(1).) Here no judgment was entered until December 22, 2005, at which time the court decreed that neither party should take anything by its respective pleading. For BTC to move for fees at that time would obviously have been quixotic at best; the odds of its being found a prevailing party were

microscopic. Its failure to seek fees therefore furnishes no basis for an implied concession that it would not have been entitled to them had matters ended differently.

### C. *Applicability of Fee Clause*

We find much merit in BTC's contention below—not pursued in its responding brief on appeal, but addressed by Mozart in its opening brief—that Mozart had no reciprocal right to fees under section 1717(a) because, given the terms of the fee provision in the commission agreement, BTC would not have been entitled to fees even if it had prevailed on its own complaint.

The fee provision at issue allowed fees in "any litigation *between the parties hereto* to enforce any provision of this Agreement . . . ." By its plain terms, the italicized phrase limits fees to litigation between the signatories, Mozart and its broker CPS. It does not appear that CPS was ever a party to either BTC's action or Mozart's cross-action. On the face of it, therefore, no part of this proceeding constituted "litigation between the parties hereto," and no part of it fell within the fee clause. It follows that neither party could assert a right to fees under section 1717(a).

 This view is supported by a sizable body of case law. In *Sessions*, *supra*, 84 Cal.App.4th 671, a payroll management company alleged that a subcontractor had failed to reimburse it for wages it paid to the subcontractor's employees. The company sued the general contractor on the theory that it was a third party beneficiary of the contract between the subcontractor and the general contractor, which contained a provision authorizing recovery of attorney fees by the prevailing party " '[i]n the event it becomes necessary for *either party* to enforce the provisions of this Agreement . . . .' " (*Id.* at p. 676, original italics.) The contract also contained recitals that it created " 'absolutely no enforceable rights' " and did not " 'create any rights of or confer any benefits upon' " third parties. (*Ibid.*, italics omitted.) The trial court sustained the general contractor's demurrer and then granted its motion for fees. (*Id.* at pp. 676–677.) The reviewing court noted that in *Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 128 [158 Cal.Rptr. 1, 599 P.2d 83] (*Reynolds*), the Supreme Court had "interpreted section 1717 to 'provide a reciprocal remedy for a nonsignatory defendant, sued on a contract as if he were a party to it, when a plaintiff would clearly be entitled to attorney's fees should he prevail in enforcing the contractual obligation against the defendant.' " (*Sessions*, *supra*, 84 Cal.App.4th at p. 679.) In *Reynolds* the plaintiff had alleged that the nonsignatory defendants were alter egos of the corporations that executed the contracts and, on that basis, had sought attorney fees. Because the plaintiff would have been entitled to such an award had he

prevailed on his alter ego claim, the Supreme Court affirmed an award of fees in favor of the defendants, who defeated that claim.

In *Reynolds* the court concluded that where a nonsignatory is sued on the ground that he stands in the shoes of a party to the contract, and where he would be liable for fees if that claim succeeded, he may recover fees under section 1717 if he defeats the claim. In *Sessions* the situation differed in two respects. First, the positions were reversed in that a nonsignatory had sued a signatory, claiming a right to recover fees; and second, the basis for the nonsignatory's claims was that he was a third party beneficiary, i.e., not one who stood in the shoes of a contracting party, but one for whose benefit the contract was made. After the signatory defeated this claim, the court found its right to fees constrained by two principles. The first is that a prevailing signatory defendant is entitled to fees only if the losing nonsignatory plaintiff " 'would have been entitled to its fees if [he] had prevailed.' " (*Sessions, supra*, 84 Cal.App.4th at p. 679, quoting *Real Property Services Corp. v. City of Pasadena* (1994) 25 Cal.App.4th 375, 382 [30 Cal.Rptr.2d 536] (*Real Property Services*).) The second is that a nonsignatory seeking relief as a third party beneficiary may recover fees under a fee provision only if it appears that *the contracting parties intended* to extend such a right to one in his position. (*Sessions, supra*, 84 Cal.App.4th at pp. 680–681.) The contract there did not reflect such an intent; on the contrary, it expressly disclaimed any conferral of rights on third parties, and the fee provision was expressly limited to enforcement actions by " '*either party*.' " (*Id.* at p. 681.) Accordingly the nonsignatory plaintiff would not have been entitled to fees had it prevailed, and the signatory defendant had no reciprocal right under section 1717. (*Sessions, supra*, 84 Cal.App.4th at p. 682.)

This approach has been embraced in a number of decisions and at least one leading treatise. (See *California Wholesale Material Supply, Inc. v. Norm Wilson & Sons, Inc.* (2002) 96 Cal.App.4th 598, 608–609 [117 Cal.Rptr.2d 390] (*California Wholesale*); *Leach v. Home Savings & Loan Assn.* (1986) 185 Cal.App.3d 1295, 1307 [230 Cal.Rptr. 553] (*Leach*); Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2007) ¶¶ 17:154.28 to 17:154.37, pp. 17-111 to 17-112.) However, a competing body of decisions may be understood to hold, with various qualifications and reservations, that even where the contract asserted by the losing party would not have allowed him fees had he prevailed, his *merely having claimed* fees will entitle his prevailing opponent to them when he loses. (See *Manier v. Anaheim Business Center Co.* (1984) 161 Cal.App.3d 503, 505–507 [207 Cal.Rptr. 508]; *Jones v. Drain* (1983) 149 Cal.App.3d 484, 489 [196 Cal.Rptr. 827] (*Jones*).) This approach has been repeatedly criticized and rejected. In *Leach, supra*, 185 Cal.App.3d at page 1306, it was described as resting on an "equitable estoppel theory" that "was first announced in *Pas v. Hill* (1978) 87 Cal.App.3d 521 [151 Cal.Rptr. 98], a case that was criticized by legal writers

and later overruled by the *Pas* court itself in *Saucedo* v. *Mercury Sav. & Loan Assn.* [(1980)] 111 Cal.App.3d [309,] 310–315 [168 Cal.Rptr. 552]." The *Leach* court concluded that in light of *Reynolds, supra*, 25 Cal.3d 124, 129, a party claiming fees under section 1717 must "establish that the opposing party *actually* would have been entitled to receive them if he or she had been the prevailing party." (*Leach, supra*, 185 Cal.App.3d at p. 1307.) Similarly, in *Sessions, supra*, 84 Cal.App.4th at pages 681–682, the court cited *Leach* and several other decisions in rejecting estoppel as a basis for awarding attorney fees against a losing nonsignatory.

■ But the estoppel view, or its equivalent, has also been repeatedly, if perplexingly and sometimes equivocally, resurrected. In *International Billing Services, Inc.* v. *Emigh* (2000) 84 Cal.App.4th 1175, 1189 [101 Cal.Rptr.2d 532] (*International Billing*), the court opined that rejecting estoppel while adhering to contract language "ma[de] little sense" because, as the court offered interrogatively, "Why would any party need to estop another party, where the provision actually—clearly—provided for fees?" We answer this question with one of our own: Why would a court predicate a holding, let alone a rule of law, on a party's "need[s]?" As the court there acknowledged, equitable estoppel generally "entails detrimental reliance" by one party on the words or conduct of the other. (*Id.* at p. 1190.) Merely praying for relief to which one is not entitled cannot ordinarily engender either reliance or detriment. Because an equitable estoppel cannot normally arise from such conduct, the court justified its rejection of *Leach* and similar cases on " '[j]udicial estoppel,' " which it defined no more clearly than " 'play[ing] fast and loose with the court.' " (*International Billing, supra*, 84 Cal.App.4th at p. 1191, quoting *Schulze* v. *Schulze* (1953) 121 Cal.App.2d 75, 83 [262 P.2d 646].) But all the offending party had done there was plead for attorney fees to which it was not entitled, and then, after its opponent prevailed on the underlying issues, erect its lack of entitlement as a defense to a claim for fees. This was hardly the kind of " ' "fraud on the court" ' " to which the doctrine of judical estoppel is directed. (*Cloud* v. *Northrop Grumman Corp.* (1998) 67 Cal.App.4th 995, 1017 [79 Cal.Rptr.2d 544], quoting *Ryan Operations G.P.* v. *Santiam-Midwest Lumber Co.* (3d Cir. 1996) 81 F.3d 355, 363; see *Gottlieb* v. *Kest* (2006) 141 Cal.App.4th 110, 131 [46 Cal.Rptr.3d 7].) The court also found the losing party's attempt to avoid fees "unfair" because it would permit a pleader to "threaten a litigant with the prospect of an adverse attorney fees award and avoid the same fate if unsuccessful." (*International Billing, supra*, 84 Cal.App.4th at p. 1191.) But this happens every time a party prays for relief to which he is ultimately held not to be entitled. Thus it might be said with equal justice that a plaintiff who prays for $100,000 in damages to which he was not entitled acted "unfair[ly]" by "threaten[ing]" his opponent with the prospect of an adverse award. Yet no one would suggest that this entitles the defendant to a judgment for $100,000.

To visit a losing claimant's own demands upon him might appeal to a sense of playground justice, but it has no basis in our law. We see no reason to treat attorney fees differently from any other form of relief for these purposes. We know of nothing in our law that justifies awarding such fees to a party merely because his opponent asked for them. Certainly section 1717(a) does not create such a regime. So long as there is reciprocity in the allowance or disallowance of fees, the policy of that statute is satisfied. The statute does not purport to authorize an award where *neither* party would otherwise be entitled to one.

Nor have the cases embracing such a theory fared well. Three years after *International Billing*, the court that rendered that decision repudiated it, at least in substantial part. (*M. Perez Co., Inc. v. Base Camp Condominiums Assn. No. One* (2003) 111 Cal.App.4th 456 [3 Cal.Rptr.3d 563] (*Perez*).) The court acknowledged that *International Billing* had not "made proper use of the [judicial estoppel] doctrine." (*Id.* at p. 469.) The "correct rule," held the court, is that "a prevailing party is entitled to attorney fees only if it can prove it would have been liable for attorney fees had the opponent prevailed." (*Id.* at p. 467; see *id.* at pp. 467–468.) Unfortunately the meaning attributed to this formula was cast in doubt by the court's apparent conclusion that the rule of *International Billing* continued to apply where the losing party had attempted unsuccessfully to establish that the alleged contract included a fee provision: "Where a party claims that a contract allows fees and proves it, that party gets fees. Where a party claims that a contract allows fees and does not prove it, the opponent gets fees." (*Perez, supra,* 111 Cal.App.4th at p. 468.) We believe the better rule is the one stated in *Leach, supra,* 185 Cal.App.3d at page 1307: A party claiming fees under section 1717 must "establish that the opposing party *actually* would have been entitled to receive them if he or she had been the prevailing party."[12] (Original italics.)

Mozart does not contest any of this. Indeed it expressly acknowledges "that the principle of judicial estoppel does not apply and that a party must not just claim the right to attorney's fees but be entitled to attorney's fees." However it never attempts to explain how BTC could be "entitled to attorney's fees" in view of the language of the fee clause. None of the cases cited by it authorizes a court to disregard an express limitation on the *character of*

---

[12] Most recently, the court that decided both *International Billing* and *Perez* appeared to adopt this approach. (*Loduca v. Polyzos* (2007) 153 Cal.App.4th 334, 341, 344 [62 Cal.Rptr.3d 780] [signatory could recover fees from losing third party beneficiary; contract named third party and contained no language suggesting intent to exclude him from reach of fee clause, making it "apparent" that signatories "intended [third party's] enforcement right to include a right to attorney fees"].) The court cited *International Billing* only on a general point of law (*Loduca v. Polyzos, supra,* 153 Cal.App.4th at p. 341), and did not cite *Perez* at all. (See also *Dell Merk, Inc. v. Franzia, supra,* 132 Cal.App.4th at pp. 450, 451 [same court, to similar effect].)

*litigation* to which an attorney fee provision will apply. In *Brusso v. Running Springs Country Club, Inc.* (1991) 228 Cal.App.3d 92, 108–109 [278 Cal.Rptr. 758], the court quoted only one of the several fee provisions involved; it was very broad, allowing fees to the prevailing party " 'in case suit shall be brought for default under this Agreement, or because of the breach of any other covenant herein . . . .' " (Italics omitted.) In *California Wholesale, supra,* 96 Cal.App.4th 598, 603, footnote 3, the contract allowed fees " '[i]f either party becomes *involved in* . . . litigation arising out of this Contract or the performance of it . . . to the party justly entitled to them.' " (Italics added and omitted.) This language could readily be understood to extend to any contract-related litigation in which either party was "involved." Its precise meaning was academic there, because the court held the nonsignatory to be an *assignee* of the contract who "thereby stepped into [a contracting party's] shoes as a matter of law." (*Id.* at p. 605.) Here, as Mozart concedes, BTC claimed to be a third party beneficiary, not an assignee. There is thus no occasion to consider whether the clause before us could be successfully invoked by an assignee.

In *Real Property Services Corp., supra,* 25 Cal.App.4th 375, the fee provision resembled the one here in that it applied by its terms only to an " 'action or proceeding *brought by either party against the other* under this Lease . . . .' " (*Id.* at p. 377, italics added.) The parties apparently made nothing of the italicized language, and the court seemed to overlook it in characterizing the clause as "specifically provid[ing] for the award of attorney fees in an action to enforce the contract." (*Id.* at p. 383.) As viewed by the court, the case turned on the sufficiency of the "nexus between the [defendant] lessor and the [plaintiff] sublessee . . . ." (*Ibid.*) In other words, the decision turned on an issue of standing, not the scope of the fee clause. "[A decision] 'is not authority for everything said in the opinion but only 'for the points actually involved and actually decided.' [Citations.]" (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 620 [71 Cal.Rptr.2d 830, 951 P.2d 399].)

In *Jones, supra,* 149 Cal.App.3d 484, the court identified the "critical issue" as "whether or not the plaintiff . . . clearly would have been entitled to attorney's fees had it prevailed in enforcing the contract." (*Id.* at p. 487.) Yet the opinion nowhere discloses the operative contract language, rendering its entire analysis doubtful as useful precedent.[13] Similarly, *Lewis v. Alpha Beta*

---

[13] Indeed, the facts of *Jones* are so vaguely described that it is difficult to see how it can serve as precedent for *any* particular holding. (See *Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689] ["Language used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered"]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 945, pp. 986–988.) One case describes *Jones* as "apparently" involving "a third party beneficiary theory." (*Real Property Services, supra,* 25 Cal.App.4th 375, 381.) This

*Co.* (1983) 141 Cal.App.3d 29 [189 Cal.Rptr. 840], is silent with respect to the wording of the fee clause there at issue. (See also *Reynolds, supra,* 25 Cal.3d 124, 127 [stating only that notes "provided for recovery of collection costs, including attorney's fees"].)

In *Manier v. Anaheim Business Center Co., supra,* 161 Cal.App.3d 503, an unsuccessful action was brought by the signatory to a deposit receipt and his wife, who had not signed the receipt but who apparently alleged that she, along with her husband, was a party to it.[14] The fee clause provided, " 'If any party to this agreement or the Broker institutes any legal action against any other party to this Agreement, the prevailing party in said action shall be entitled to a reasonable attorneys fee, in addition to any other judgment of the court.' " (*Id.* at p. 505, fn. 1.) Applied literally this might permit recovery of fees by any party to the litigation, so long as a party to the agreement initiated the action. But the court little heeded the actual language of the contract. Instead it rejected the wife's attempt to take "refuge in the fact she was not a signatory to the deposit receipt" by stating, "[I]t is of no moment that [the wife] was not a signatory to the deposit receipt; she alleged entitlement to attorneys fees under it." (*Id.* at p. 508.) The court also adopted the dictum in *Jones* that " 'it is extraordinarily inequitable to deny a party who successfully defends an action on a contract, which claims attorney's fees, the right to recover its attorney's fees and costs simply because the party initiating the case has filed a frivolous lawsuit.' " (*Id.* at p. 508, quoting *Jones, supra,* 149 Cal.App.3d at pp. 489–490.) We will not attempt to parse this rather murky declaration. Insofar as these decisions base an award of attorney fees on the mere fact that the losing party prayed for them, we decline to follow them.

Mozart also describes the fee provision here as "broad" and "analogous to those in the *Xuereb v. Marcus & Millichap, Inc.*(1992) 3 Cal.App.4th 1338 [5

reading is difficult to reconcile with the losing plaintiff's assertion, which the court refused to address, that he "was not a party to or a beneficiary of the contract." (*Jones, supra,* 149 Cal.App.3d at p. 488.) Mozart asserts that the fee provision in *Jones* appeared in a "Listing Agreement" signed by the prevailing defendant owners. This hypothesis is cast in serious doubt by the joinder in *Jones* of the would-be *buyers* as plaintiffs. (See *Jones, supra,* 149 Cal.App.3d at p. 486.) This suggests that the suit rested at least in part on some instrument contended by the plaintiffs to constitute a sale contract. Perhaps the complaint rested on two instruments. All the decision reveals is that an unknown document contained a fee provision of unknown terms; the broker claimed it was a contract; the trial court found otherwise; and the reviewing court held that this finding was not a bar to a fee award in favor of the prevailing owners.

[14] The opinion suffers from some of the same vagueness as *Jones, supra,* 149 Cal.App.3d 484 with respect to crucial details, most notably the legal and factual basis for the wife's claim.

Cal.Rptr.2d 154] and *Santisas v. Goodin*[, *supra*,] 17 Cal.4th 599, 608 line of cases." But while the fee clause in *Xuereb v. Marcus & Millichap, Inc.*, *supra*, 3 Cal.App.4th at page 1340, was limited to litigation " 'between . . . the parties hereto,' " that limitation had no bearing on the action there, which was between contracting parties. Nor was there any comparable issue in *Santisas v. Goodin*, *supra*, 17 Cal.4th at page 603, where in any event the fee clause extended to any legal action " 'instituted by the Broker(s), or any party to this agreement, or arising out of the execution of this agreement or the sale, or to collect commissions . . . .' "

We conclude that BTC could not have recovered its fees had it prevailed on its claims. Therefore Mozart had no reciprocal right to fees under section 1717.

## III. *Denial of Motion to Vacate*

In the later of its two notices of appeal, Mozart expressed an intention to appeal from the order denying its motion to vacate the judgment of dismissal on its cross-complaint. However, while that order is mentioned at several points in Mozart's opening brief, no separate argument and no distinct ground of reversal are directed to it. BTC points out this omission in its brief and asserts that Mozart has thus "waived" any objection to that order. It goes on, however, to argue that the order was correct because of procedural defects in the motion. Mozart takes issue with the latter argument but does not address the effect of its own failure to argue the point in its opening brief. We agree that the failure to proffer argument in support of this severable portion of the appeal constitutes an abandonment of it. In any event we detect no error in the order denying the motion to vacate. The premise of the motion appears to have been that local real estate practice obligated BTC to continue acting as an agent in the transaction until Handspring took possession of the premises or began paying rent. For reasons stated at length in connection with the order sustaining the demurrer, acceptance of this premise would not have warranted overruling BTC's demurrer to the cross-complaint.

## IV. *Cross-appeal*

As noted above, BTC has explicitly made its cross-appeal conditional upon our sustaining some part of Mozart's appeal. Since we have rejected that appeal in its entirety, we view BTC's statements on this point as an abandonment of the cross-appeal, which we will therefore dismiss.

### DISPOSITION

The judgment is affirmed. The order denying attorney fees is affirmed. The appeal from the order denying the motion to vacate is dismissed. The cross-appeal is dismissed.

Respondents and cross-appellants shall recover their costs on appeal.

Premo, J., and Elia, J., concurred.