Filed 1/16/14  Nissan Motor Acceptance v. Superior Automotive Group CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| NISSAN MOTOR ACCEPTANCE CORPORATION, | |
| | G046914 |
| Plaintiff, Cross-defendant and Respondent, | |
| | (Super. Ct. No. JCCP 4613) |
| v. | |
| | O P I N I O N |
| SUPERIOR AUTOMOTIVE GROUP et al., | |
| | |
| Defendants, Cross-complainants and Appellants. | |

Appeal from a judgment of the Superior Court of Orange County, Ronald L. Bauer, Judge.  Reversed in part and remanded with instructions.

Miller Barondess, Louis R. Miller, Amnon Z. Siegel and Mira Hashmall for Defendants, Cross-complainants and Apellants.

Severson & Werson, Jan T. Chilton and Mark Joseph Kennedy for Plaintiff, Cross-defendant and Respondent.

Michael Kahn, the owner of seven car dealerships that composed Superior Automotive Group (SAG), accuses the lending company that financed his automobile empire of causing its collapse.  This appeal concerns certain trial court rulings that stopped the jury from reaching Kahn's and SAG's tort claims in their cross-complaint against the lender.

The lender, Nissan Motor Acceptance Corporation (NMAC), sued Kahn and SAG for breach of various loan agreements and obtained a $40 million contractual damages award.  Kahn and SAG do not appeal from the jury verdict on the contract claims and instead appeal only from the judgment against them as to certain claims in their cross-complaint.  Essentially, they contend the trial court erred in excluding under the parol evidence rule all evidence of fraudulent oral promises by NMAC, which led to pretrial dismissal of their fraud claims and nonsuit as to their claims for fraudulent concealment and violation of the Automobile Dealers Day in Court Act (15 U.S.C. § 1221 et seq; ADDCA).

We agree the trial court erred in its parol evidence ruling as well as in granting the partial nonsuit.  We further find these errors prejudicial.  Consequently, we reverse the judgment in part and remand for a retrial of appellants' claims against NMAC for negligent and intentional misrepresentation, promissory fraud, fraudulent concealment and violation of the ADDCA.

**FACTS AND PROCEDURAL HISTORY**

A.  *Background*

In 2008, before this litigation commenced, Kahn owned and operated seven automobile dealerships across California.  SAG was comprised of four Nissan stores, two Toyota stores, and one Chevrolet store.  NMAC financed six of the seven dealerships (the Dealerships), all but the Chevrolet store.  NMAC provided a full complement of financing for the Dealerships, including construction financing, loans for furniture,

2

fixture and equipment purchases (FF&E financing), and most particularly, "inventory" financing.

Through inventory financing, NMAC provided lines of credit to authorized Nissan dealers to purchase vehicles from its parent company, Nissan North America, for resale to the public. NMAC's standard Wholesale Financing Agreement (WFA) set the terms for inventory financing, including the requirement that a dealer must remit payment to NMAC for every sold vehicle within the *earlier* of: (a) two days after the purchaser has paid the dealer for the vehicle, or (b) 10 days from the date of sale, regardless of whether the dealer has received payment (the 2-day/10-day rule).

In industry parlance, if a dealer fails to pay NMAC timely under the 2-day/10-day rule, the dealer is "out of trust" or has an "SOT" for the inventory balance owing — technically, an event of default under the WFA. Testimony established that, notwithstanding the 2-day/10-day rule, it was common for Kahn and other dealers to pay more slowly than the letter of the rule allowed. In fact, it was NMAC policy to tolerate an SOT of up to 25 percent of inventory sold but not yet paid for at a store; it was also policy for NMAC, upon discovering any SOT in its periodic audits of dealerships, to demand immediate payment of the SOT within 24 hours.

As the 2008 economic downturn hit the automotive industry, many Nissan dealerships, including Kahn's, were increasingly late on inventory payments. A June 2, 2008 audit by NMAC revealed the Dealerships had an SOT of approximately $1.36 million. Though Kahn eventually paid the SOT, he continued to struggle with making timely inventory payments as well as meeting other loan obligations, and so sought assistance from NMAC.

On June 23, 2008, Kahn and NMAC entered into a "forbearance agreement" (the June FA) that gave Kahn some breathing room by extending certain of the Dealerships' payment obligations for six months, subject to certain conditions. The June FA also provided that, in regard to the Dealerships' various defaults under the WFA

3

(including untimely inventory payments), NMAC would forbear until December 31, 2008, from exercising its rights and remedies under the WFA. The June FA stated that in the event of a "further default" under the WFA during the forbearance period, including any failure to comply with the 2-day/10-day rule, NMAC "has the right" to exercise its rights under the WFA against the Dealerships, borrowers and guarantors of the various loans.

Soon after executing the June FA, the Dealerships were again SOT. On July 1, 2008, the parties amended the June FA with a new document (the July Amendment) that acknowledged the Dealerships' new SOT of approximately $752,000, and Kahn's promise to pay it within two days, as well as NMAC's continued agreement to forbear from exercising its rights and remedies under the WFA despite this new "event of default," in exchange for $15 million worth of additional collateral to be put up by Kahn, the Dealerships (each a separate LLC), and guarantors (Kahn, his wife, and a family trust). Like the June FA, the July Amendment stated that in the event of any further default under the WFA, NMAC "has the right" to exercise any of its remedies under the WFA against the Dealerships, borrowers and guarantors.

By September 2008, the recession's effect on the Dealerships had deepened, causing a 40 percent drop in sales from pre-recession levels. The September audit revealed an SOT of $800,000, which grew to $1.4 million before SAG paid it on October 1. The October 10, 2008 audit revealed the Dealerships had an extremely large SOT of $4.5 million. Kahn was also struggling to make other payments due to NMAC for mortgages, construction loans, and FF&E financing for various dealerships.

In October 2008, Kahn approached Steve Lambert, president of NMAC, and Kevin Cullum, NMAC director of commercial lending, to ask for NMAC's help in enabling the Dealerships to survive the recession. Kahn, Lambert and Cullum began negotiating a new forbearance agreement that would involve rolling the SOT into a capital loan or "cap" loan, payable over five years, as well as making additional loans to

4

provide working capital and a $2 million FF&E loan for completion of the new Oakland dealership Kahn was building.

B. *The Purported Oral Promises*

Because the trial court's in limine parol evidence ruling barred Kahn from presenting at trial his evidence of purportedly fraudulent oral promises by NMAC, the following facts are taken from Kahn's testimony and other evidence presented at the pretrial hearing.

Kahn testified that in several conversations occurring in mid-October through November 3, 2008, Lambert made specific oral promises to him that NMAC would continue to finance the operations of the Dealerships in 2009 to help them ride out the recession.[1] Kahn testified that he told Lambert that he would likely "get out of trust again," and in response Lambert assured Kahn that NMAC would not treat Kahn's inability to comply with the 2-day/10-day rule as an event of default under the WFA. Kahn testified Lambert told him: "'Don't worry about it. Do the best you can and just keep' — he got into cutting expenses, make sure you're doing this."

Kahn further testified that, in exchange for this promise of continued financing through 2009, Lambert demanded that Kahn sell a newly acquired Toyota dealership located in San Juan Capistrano (the SJC dealership). Kahn had purchased the SJC dealership in 2007 with financing from Bank of America. When the recession hit in 2008, Bank of America gave Kahn a 30-day notice of intent to terminate financing and, at Kahn's request, NMAC stepped in with replacement financing to keep the SJC dealership afloat. By the fall of 2008, NMAC's loans to Kahn for the SJC dealership totaled approximately $30,000,000 ("the key biggest loan I had"). According to Kahn, Lambert

---

[1] In his testimony, Kahn explained that the promised "continued financing through 2009" meant, essentially, two "cap" loans: one, right away, for $7.7 million, representing the Dealerships' then-SOT (see next section on November Forbearance Agreement), and a second loan in 2009 for as much as $12 million, as needed to cover any newly accrued SOT and other operating expenses.

5

demanded that Kahn sell the SJC dealership by December 31, 2008, and remit the proceeds to NMAC as a condition of obtaining the financing needed to carry the Dealerships through 2009.

Kahn testified that he complained to Lambert he would "take a bath" on a year-end sale at the bottom of the market. Still, he agreed to NMAC's demand that he sell the SJC dealership, telling Lambert: "'[I]f that's what's gonna save my entire company, then we'll do what we gotta do.'" Kahn summarized "the generalities" of Lambert's promise as follows: "I sell San Juan, he would get me through '09."

Kahn also testified that on January 5, 2009, Lambert reiterated his earlier promises to get the Dealerships the financing they needed in 2009. In a conference call among key personnel of both NMAC and SAG, Lambert told Kahn, "You get me a pro forma, show us how you're going to use the funds, and we'll get you the money."

*C. The November Forbearance Agreement*

By late October 2008, the Dealerships' SOT had ballooned to $7.7 million. On November 4, 2008, SAG and NMAC entered into a new Forbearance Agreement (the November FA) which expressly superseded the June FA and the July Amendment. In the November FA, NMAC agreed to provide a five-year cap loan of $7.7 million that would be applied to satisfy the SOT. Kahn gave NMAC deeds of trust on four pieces of his own real estate, including his personal residence, as security for the $7.7 million cap loan, collectively amounting to over $30 million in new collateral. This was a significant benefit for NMAC because the SOT had been unsecured: The only collateral for inventory financing is the vehicle sitting on the lot; once the vehicle is sold, NMAC loses its security interest in the car.

Other provisions in the November FA included a six-month deferral of all payments of interest and principal SAG owed, and an agreement by NMAC to give SAG a $2 million FF&E loan for Oakland.

6

The new agreement acknowledged, as had the superseded documents, that the Dealerships had defaulted under the WFA by failing to make timely inventory payments and that NMAC would forbear until December 31, 2008, from exercising its rights and remedies under the WFA for that default.

There was one significant difference between the superseded documents and the November FA. Where the June FA and July Amendment stated that NMAC "has the right to exercise its remedies" under the WFA in the event of a further default, the November FA stated that any further failure to comply with the 2-day/10-day rule would result in termination of all existing and future financing for the Dealerships. The relevant contract provision is as follows: "If any Dealership causes an additional hard SOT (defined as any units reported sold and funded or unfunded outside of NMAC guidelines: i.e., 2 days after funding or 10 days after reported sale), then *all debt* outstanding of all Borrowers and Guarantors *will become due and payable and all credit lines will be cancelled*." (Italics added.)

D.  *"Pulling the Plug"*

Much of the following evidence was excluded at trial under the parol evidence rule, and thus comes from the transcript of the pretrial hearing.

On December 17, 2008, Kahn sold the SJC dealership for $28 million and paid the proceeds to NMAC. The sale price was $2 million shy of the debt owed on that dealership. Kahn testified that he personally lost $8 million on the sale of the SJC dealership.

The next day, Kahn and his team called Lambert and Cullum to discuss "the going forward plan for '09." Having complied with Lambert's demand that he sell the SJC dealership, Kahn was eager to arrange the additional financing Lambert had promised he would extend to get the Dealerships through 2009.

The Dealerships were still struggling financially. The inventory balance was again fluctuating, with the Dealerships intermittently SOT, though NMAC did not

7

declare a "hard SOT" and impose the severe penalty stated in paragraph 4 of the November FA. On December 18, 2008, Cullum responded to Kahn's attempt to start discussing 2009 financing plans by telling him "not to worry about it right now," and that they could talk after New Year's.

It is Kahn's contention in this litigation that despite Cullum's pre-Christmas assurances, NMAC and Lambert had no intention of honoring Lambert's promise of continued financing for the Dealerships through 2009. Instead, according to Kahn, Lambert and NMAC had a secret plan to squeeze from Kahn as much money and additional collateral as they could until the time was ripe to freeze financing and shut down the Dealerships, ultimately seizing the Dealerships and Kahn's other assets.

Kahn viewed two incidents as proof of this "secret plan" scenario. The first occurred on January 5, 2009, when Kahn and his team called Lambert and Cullum to discuss an additional cap loan and other financing to get the Dealerships through 2009. In the conference call, Lambert asked Kahn how much money the Dealerships would need over the next six months. Lambert stated that he wanted to see a six-month projection of the Dealerships' financial performance, showing how the Dealerships would use the funds from NMAC and when they would need the funds. Lambert told Kahn, "[You] get me a pro forma, show us how you're going to use the funds, and we'll get you the money."

Unbeknownst to Kahn, however, earlier that same day Cullum had told NMAC executives that he and Lambert agreed that Kahn would get no new funding. Cullum also stated that he expected the Dealerships to become SOT "anytime now," providing a technical justification for declaring a hard SOT and terminating all financing for the Dealerships.

The second key incident took place a few days later. On January 7, 2009, Kahn's team submitted to NMAC the requested projections of the Dealerships' cash flow through April 2009. The projections forecasted the Dealerships would lose

8

approximately $4 million through April 2009. Lambert e-mailed Cullum about the projections the next day, stating: "If it will cost them another $4M to stay afloat through April plus we are kicking in $1.2 M per month [the deferred interest and principal on all loans per the November FA], or a total of $11M through June all in, *it is time to pull the plug*." (Italics added.)

Kahn contends that within hours of receiving Lambert's e-mail, Cullum got his staff working to ensure NMAC was fully secured with as much collateral as possible before freezing Kahn's financing. Cullum told his staff to obtain Kahn's home as collateral and to "grab the valuable ones" when it came to Kahn's other personal assets.

Despite NMAC's clear intention to "pull the plug" on SAG, it did not disclose this fact to Kahn. Nor did it immediately act on the intention. NMAC continued its previous pattern of tolerating SOT's. It did not impose the extreme penalty for a "hard SOT" provided in paragraph 4 of the November FA, despite the fact SAG often paid late for inventory. In fact, the Dealerships had an SOT of $1.5 million on January 16, 2009 — the same day the parties executed an extension of the November FA (the January Extension). The January Extension referenced the November FA and extended the forbearance period through March 31, 2009 (it had expired on December 31, 2008). The January Extension provided for a new loan to SAG of approximately $4.4 million to cover the deficiency from the SJC sale and to provide "working capital" for the Dealerships. As part of the January Extension agreement, Kahn gave NMAC another deed of trust on his family home for $1.9 million.

Kahn, believing Lambert would honor his oral agreement to continue providing the financing SAG needed to get through 2009, took the following actions: He sold his personal interest in a private jet, raising $800,000 that he gave to NMAC to pay down the debts owed. Kahn poured millions of his own funds into the Dealerships to support operations. He signed the January Extension and gave NMAC the additional

$1.9 trust deed on his home, and he also obtained another loan for the new Oakland dealership, which was nearing completion.

Then, without warning, NMAC pulled the plug. On February 10, 2009, Cullum called SAG's chief financial officer Jay Larsen and told him the Dealerships were $1.6 million SOT and demanded immediate payment of the entire sum. Larsen responded that for months the Dealerships had been SOT off and on, but had always caught up, and would again. Larsen was scheduled for heart surgery the next day, so he told Cullum to speak with Kahn about resolving the SOT.

On February 11, 2009, NMAC sent a written demand to SAG for payment within 24 hours of the $1.65 million SOT, warning that if the entire SOT was not paid by the deadline, NMAC would default the Dealerships, declare all outstanding loans due, and terminate the inventory credit lines.

The next day, on February 12, 2009, Kahn attempted to call Lambert to discuss the next steps for paying the inventory balance, but Lambert refused to take the call. Kahn had previously told Lambert that he was expecting soon a cash infusion of $4 million.

SAG was unable to raise the $1.65 million demanded by the February 12 deadline. NMAC declared the Dealerships in default for a "hard SOT" under paragraph 4 of the November FA, declared all loans due and payable, canceled the Dealerships' lines of credit and terminated the franchise agreements.

On February 24, 2009, NMAC filed in several different counties a total of five actions against SAG and each of the Dealerships for breach of various loan and lease agreements. Several months later, NMAC filed an action in Orange County Superior Court against Kahn, his wife, and others, on the guarantees for the loans. By order of Chair of the Judicial Council, all these cases were eventually coordinated in Orange County Superior Court.

10

On August 25, 2010, Kahn and SAG (collectively SAG) filed a coordinated cross-complaint against NMAC and Lambert (collectively NMAC). The cross-complaint asserted causes of action against NMAC for promissory fraud (intentional and negligent misrepresentation, false promises), based on Lambert's oral promise to Kahn that NMAC would continue funding the Dealerships through 2009 regardless of SOT's.

The cross-complaint also stated causes of action for constructive fraud, fraudulent concealment and violation of the ADDCA, based on cross-defendants' implementation of their secret plan to grab as much cash and collateral from Kahn as possible before using a pretext to declare a "hard SOT," freeze financing, and seize the Dealerships' and Kahn's other assets. The cross-complaint also contained claims for breach of contract and related contract claims.

*E. The Parol Evidence Fight in the Trial Court*

On July 14, 2011, NMAC moved for summary adjudication of all the claims in the cross-complaint. NMAC contended SAG could not prevail on its fraud claims because the parol evidence rule barred evidence of Lambert's purported oral promise to continue financing through 2009 despite violation of the 2-day/10-day rule, and SAG could not prove reasonable reliance on that oral promise. On October 18, 2011, the trial court denied summary adjudication on all issues, finding triable issues of fact.

Ten days later, on the eve of trial, NMAC moved in limine for an evidentiary hearing to determine if the parol evidence rule applied to bar evidence of Lambert's purported oral promise to ignore SOT's and provide continued financing through 2009. Codified at Civil Code section 1625[2] and Code of Civil Procedure section 1856,[3] the parol evidence rule bars the use of extrinsic evidence, including evidence of

---

[2] Civil Code section 1625 provides: "The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument."

any prior or contemporaneous oral agreement, to alter or add to the terms of a writing intended as a final expression of the parties' agreement. (*Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1174 (*Riverisland*).)

A longstanding exception to the parol evidence rule allows a party to present extrinsic evidence to show the agreement was tainted by fraud. (*Riverisland*, *supra*, 55 Cal.4th at p. 1172; see Code Civ. Proc., § 1856, subd. (g) ["This section does not exclude other evidence . . . to establish . . . fraud"].) Case law plainly applicable at the time of the hearing, however, narrowly limited the fraud exception. In *Bank of America Etc. Assn. v. Pendergrass* (1935) 4 Cal.2d 258 (*Pendergrass*), the California Supreme Court held that parol evidence may only be offered to prove fraud if the evidence establishes an independent fact or representation that does not directly contradict the terms of the written contract. (*Id.* at p. 263.)

Upon NMAC's motion, the trial court conducted an Evidence Code section 402 hearing to determine the preliminary facts relevant for application of the parol evidence rule here: whether the November FA and January Extension (collectively Forbearance Agreements) constituted an integrated contract and, if so, whether Lambert's purported fraudulent promises directly contradicted that contract, making them inadmissible under *Pendergrass*.

After a two-day hearing consisting of live testimony from Cullum and Kahn, recorded deposition testimony, and extensive argument, the trial court ruled that the Forbearance Agreements constituted an integrated agreement and that Lambert's alleged fraudulent promises directly contradicted the terms of that agreement. Consequently, the trial court concluded, under *Pendergrass*, that the fraud exception to

---

3 Code of Civil Procedure section 1856 provides, in pertinent part, as follows: "(a) Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to the terms included therein may not be contradicted by evidence of a prior agreement or of a contemporaneous oral agreement."

the parol evidence rule did not apply and evidence of Lambert's fraudulent promises was inadmissible at trial.

In response to that ruling, SAG amended the cross-complaint, effectively dismissing the promissory fraud claims, and dismissed Lambert as a cross-defendant. The new amended cross-complaint contained only claims against SAG for breach of contract, constructive fraud, fraudulent concealment and violation of the ADDCA. The amended cross-complaint deleted all references to Lambert's oral promises to Kahn of continued funding regardless of untimely inventory payments.

*F. Trial, Partial Nonsuit and Judgment*

The parties conducted an eight-day trial on NMAC's breach of contract claims and on SAG's cross-complaint for breach of contract, constructive fraud, fraudulent concealment and violation of the ADDCA. SAG based its proof of the constructive fraud, fraudulent concealment and ADDCA claims on evidence that NMAC failed to disclose its intent as of January 5, 2009, to "pull the plug" and terminate the Dealerships' financing by a sudden insistence on strict compliance with the 2-day/10-day rule and immediate payment of a $1.6 million SOT. SAG contended this conduct was fraudulent and wrongful because NMAC had tolerated SOT's for months, even after the November FA which supposedly imposed a doomsday penalty for any "hard SOT." SAG contended NMAC's course of conduct in tolerating SOT's lulled Kahn into believing he did not have to sell any of his substantial personal assets (approximately $135 million as of May 2008) to generate sufficient cash to prevent any SOT's, action he would have taken had he known an SOT would effectively destroy the Dealerships.

At the close of evidence, NMAC made an oral motion for nonsuit as to each of SAG's claims. The trial court denied nonsuit as to SAG's contract claims, but granted nonsuit as to the other claims.

The jury returned a verdict of approximately $40 million for NMAC on its contract claims and awarded SAG nothing on its contract claims. SAG filed the instant

13

appeal from the judgment only as to certain claims in its cross-complaint.  SAG appeals from the trial court's in limine ruling that the parol evidence rule barred all evidence of Lambert's oral promises not to enforce the 2-day/10-day rule, and SAG also appealed from the order granting nonsuit on the fraudulent concealment and ADDCA claims. SAG does not appeal the nonsuit as to constructive fraud.

## G.  *The Appellate Briefing, and the Riverisland Decision*

SAG filed its appellant's opening brief on November 13, 2012.  The parol evidence arguments in the brief contested the trial court's finding that the Forbearance Agreements were integrated, and that Lambert's purported oral promises directly conflicted with the written agreement.  The brief also challenged the grant of nonsuit by arguing the evidence presented at trial was sufficient to bring the fraudulent concealment and ADDCA claims to the jury.

On January 14, 2013, shortly before NMAC filed its respondent's brief, the California Supreme Court issued its decision in *Riverisland*, *supra*, 55 Cal.4th 1169.  In *Riverisland*, the high court overturned the 78-year-old *Pendergrass* rule that oral promises directly contradicting a written contract are inadmissible to prove fraud. *Riverisland* characterized the *Pendergrass* decision as "an aberration" and declared "its restriction on the fraud exception was inconsistent with the terms of the statute, and with settled case law as well."  (*Riverisland*, at p. 1182.)

NMAC's respondent's brief acknowledged the *Riverisland* holding, but argued it should apply only prospectively, and should not affect this case on appeal.  We granted SAG's request for leave to address *Riverisland* in its reply brief.  Unsurprisingly, SAG argued *Riverisland* is applicable and warrants the requested partial reversal of the judgment.  With our leave, NMAC filed a supplemental respondent's brief, and SAG filed a supplemental reply.

14

The central issue on appeal is whether the *Riverisland* decision overturning the *Pendergrass* rule applies to this case. SAG argues, based on *Riverisland*, that the trial court erred in excluding the evidence of Lambert's fraudulent oral promise to continue financing the Dealerships through 2009 regardless of untimely inventory payments. SAG contends the trial court's erroneous application of the parol evidence rule severely prejudiced its case, leading to the dismissal of the promissory fraud claims and the erroneous grant of nonsuit on the fraudulent concealment and ADDCA claims.

NMAC argues in response that *Riverisland* applies only prospectively and cannot be a basis for finding the trial court erred in barring the parol evidence at issue. Moreover, NMAC argues that if *Riverisland* does apply, the exclusion of SAG's parol evidence was at most harmless error because "no reasonable juror could conclude that [SAG] justifiably relied on the supposed oral promise, so those claims would have been non-suited just as [SAG's] other fraud claims were . . . ." NMAC further asserts the trial court properly granted nonsuit as to the fraudulent concealment and the ADDCA claims because SAG failed to produce evidence as to essential elements of each claim.

We conclude SAG is correct in asserting the *Riverisland* decision applies to this case. Consequently, the trial court erred in excluding the evidence of Lambert's oral promises to Kahn. Moreover, we find that error was prejudicial, dooming not only SAG's promissory fraud claims but its fraudulent concealment and ADDCA claims as well.

*1. The Exclusion of SAG's Parol Evidence Was Error Under Riverisland*

NMAC faces a steep uphill battle in contesting the retroactive application of the *Riverisland* decision. "'It is the general rule that a decision of a court of supreme jurisdiction overruling a former decision is retrospective in its operation.' [Citation.]" (*Neel v. Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 193.) Courts "have recognized exceptions, however, when considerations of fairness and public policy

15

preclude full retroactivity. [Citations.]" (*Ibid*.) Such considerations weigh heavily in favor of a retrospective, not prospective, application of *Riverisland*. [4]

In *Riverisland*, *supra*, 55 Cal.4th 1169, the Supreme Court was very clear about the multiple policy considerations underlying its decision to overrule *Pendergrass* and abrogate the significant limitation it imposed on the fraud exception. The high court explained that the *Pendergrass* rule was "an aberration" (*Riverisland*, at p. 1182) that "is difficult to apply[,] . . . conflicts with the doctrine of the Restatements, most treatises, and the majority of our sister-state jurisdictions . . . [and] departed from established California law at the time it was decided, and neither acknowledged nor justified the abrogation." (*Id.* at p. 1172.) *Riverisland* further stated that the *Pendergrass* rule's "limitation on the fraud exception is inconsistent with the governing statute" (*Riverisland*, at p. 1179), defying "the unqualified language of [Code of Civil Procedure] section 1856, which broadly permits evidence relevant to the validity of an agreement and specifically allows evidence of fraud . . . ." (*Id.* at p. 1175.) Perhaps most importantly, *Riverisland* found that "the rule established in *Pendergrass* may actually provide a shield for fraudulent conduct." (*Id.* at p. 1172.) The Supreme Court's decisive and emphatic rejection of the *Pendergrass* rule leaves little doubt that it should apply immediately to all pending cases.

NMAC argues that "*Riverisland* wrought an abrupt, unforeseeable change in a basic, well-settled rule of California law" and, thus, its retroactive application would be unfair because the parties relied on the *Pendergrass* rule in drafting the contract. At oral argument, NMAC asserted that, going forward, contracting parties can "contract around" *Riverisland*. We need not decide whether clever drafters of future contracts will find a way to avoid the fraud exception. We decide simply that in overruling *Pendergrass*, the Supreme Court intended to remove an unwarranted judicially-created

---

[4] Two published cases have applied *Riverisland* retroactively. (See *Thrifty Payless, Inc. v. The Americana At Brand, LLC*, (2013) 218 Cal.App.4th 1230, 1240; *Julius Castle Restaurant, Inc. v. Payne* (2013) 216 Cal.App.4th 1423, 1426.)

16

limitation on the fraud exception, and that considerations of fairness and public policy are served by giving that decision immediate, retroactive effect. As the high court itself noted, its decision to overrule *Pendergrass* "reaffirm[ed] the venerable maxim stated in *Ferguson v. Koch* [(1928),] 204 Cal. [342] at page 347: '[I]t was never intended that the parol evidence rule should be used as a shield to prevent the proof of fraud.'" (*Riverisland*, *supra*, 55 Cal.4th at p. 1182.)

2. *The Erroneous Parol Evidence Ruling Was Prejudicial*

NMAC argues that even if the trial court erred in excluding SAG's parol evidence, the error was harmless because, based on "[t]he evidence adduced at the 402 hearing and at trial . . . no reasonable juror could conclude that [SAG] justifiably relied on the supposed oral promise." In other words, NMAC contends it was virtually guaranteed a judgment of nonsuit on the promissory fraud claims. NMAC points to the evidence of Kahn's dogged negotiations with NMAC over the language of the penalty provision in paragraph 4 of the November FA as irrefutable proof Kahn understood NMAC would impose that harsh contractual penalty if SAG violated the 2-day/10-day rule. Additionally, NMAC contends that Kahn, a sophisticated businessman, knew Lambert's oral promise of continued funding regardless of SOT's in exchange for Kahn's sale of the SJC dealership was unenforceable because the men had not agreed on specific terms such as the amount of the new loan, the identity of the borrower, or the security for the loan.

NMAC's argument fails for two reasons. The first reason is that reasonable reliance is an inherently factual inquiry rarely amenable to resolution as a matter of law. As the California Supreme Court explained in *Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal. 4th 1226: "'Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact.' [Citations.]" (*Id*. at p. 1239.)

17

The second reason we decline to decide the issue of reasonable reliance as a matter of law is that it would be patently unfair to do so when SAG had no opportunity to present its full evidence on the reliance issue. At the Evidence Code section 402 hearing, the trial court strictly limited the testimony to two questions: whether the Forbearance Agreements constituted integrated written agreements and whether Lambert's purported oral promises directly conflicted with those agreements. At several points during the hearing, both NMAC's counsel and the trial court reminded SAG's attorney, Louis Miller, that he had to confine his questioning of Kahn to "the integration phase questioning." Miller's attempt to explore directly the basis of Kahn's reliance on Lambert's promises drew an immediate relevancy objection, which the trial court sustained.[5] At trial, of course, the in limine ruling barred SAG from presenting any evidence of Lambert's oral promises and, by necessity, also precluded any evidence of Kahn's reliance on such promises. Because SAG had no opportunity to establish the factor of reasonable reliance, basic concepts of fairness preclude a finding against SAG on that issue. (See *Gordon v. Nissan Motor Co., Ltd*. (2009) 170 Cal.App.4th 1103, 1114-1115 ["when a trial court erroneously denies *all* evidence relating to a claim . . . the error is reversible per se because it deprives the party offering the evidence of a fair hearing and of the opportunity to show actual prejudice"].)

Finally, we note that notwithstanding the evidentiary constraints put on SAG in the pretrial and trial proceedings, SAG did manage to present substantial

[5] The hearing transcript reveals the following colloquy between Kahn and his attorney, Miller, and its interruption by an objection from NMAC's attorney, Kenney:
*Miller*: "Did you rely on Steve Lambert's statements to you about if you sold San Juan Capistrano, NMAC would support you financially through '09?"
*Kahn*: "100 percent, yes."
*Miller*: "Why?"
*Kenney*: "Objection. It's irrelevant."
*Court*: "Sustained."

18

evidence that Kahn reasonably relied on Lambert's oral promises of continued funding regardless of SOT's. That evidence consisted of NMAC's course of conduct in tolerating SOT's even after the November FA, as well as the personal trust Kahn placed in Lambert as a result of their longstanding working relationship, "CEO to CEO."[6]

We conclude there is no basis for finding as a matter of law that SAG could not establish reasonable reliance on Lambert's oral promises. Consequently, the trial court's error in excluding SAG's parol evidence, resulting in the dismissal of SAG's promissory fraud claims, was prejudicial.

2. *The Riverisland Error Also Requires Reversal of the Partial Judgment of Nonsuit*

A nonsuit is properly granted only when, disregarding conflicting evidence, giving plaintiff's evidence all the value to which it is legally entitled, and indulging in every legitimate inference that may be drawn from the evidence, there is insufficient evidence to support a verdict in the plaintiff's favor. (*Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 838-839.) The de novo standard of review applies to an order granting nonsuit. (*CC-California Plaza Associates v. Paller & Goldstein* (1996) 51 Cal.App.4th 1042, 1050-1051.)

SAG contends the trial court erred in granting nonsuit as to its claims for fraudulent concealment and violation of the ADDCA. SAG argues the trial court's erroneous parol evidence ruling curtailed its proof as to both claims, necessitating reversal of the nonsuit and retrial of the claims. SAG further contends that even its

---

[6] Kahn testified at the Evidence Code section 402 hearing: "[Lambert and I] had worked together through some other problems that we got through. We had been doing business together for years. I had no reason, in my wildest dreams, not to believe that Mr. Lambert was going to do what he said. I wasn't worried about where we were going to put it [i.e., the lien on the collateral that would be required for the additional financing needed to get through 2009] at that point. I had his wo2rd and I was very comfortable with that."
*Counsel*: "That somehow he'd get you through '09?"
*Kahn*: "Not somehow. He said he would."

19

truncated presentation of evidence was sufficient to defeat nonsuit. SAG's arguments have merit.

### a. Nonsuit As To Fraudulent Concealment

NMAC contends the trial court properly granted nonsuit as to the concealment claim because SAG failed to prove three elements of the claim: concealment of a material fact, duty to disclose that fact, and detrimental reliance. (*Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC* (2008) 162 Cal.App.4th 858, 868.) NMAC's arguments, however, mischaracterize SAG's contentions in the lawsuit and ignore the impact of the trial court's erroneous parol evidence ruling on SAG's proof of this claim. The resulting prejudice requires reversal of the nonsuit.

As for the first "unproved" element of concealment, NMAC asserts it fully disclosed both its intention "not to make additional loans to [SAG]" and its intention "not to tolerate additional hard SOTs." NMAC points to paragraph 4 of the November FA and specific warnings in Cullum's January 16, 2009 letter transmitting the January Extension, as proof that NMAC did not hide these intentions from SAG. But the intentions expressed in these documents are entirely beside the point. SAG's claim is that Lambert fraudulently concealed the material fact that he decided not to honor his *oral promises* to Kahn. Significantly, the trial court's erroneous parol evidence ruling forced SAG to prove its claim of concealment without proving Lambert made the oral promises in question. If SAG failed to prove concealment under those circumstances, the fault is not SAG's. Given that the trial court's *Riverisland* error prevented SAG from presenting all the evidence relevant to its concealment claim, the nonsuit cannot stand.

As for the supposed unproved element of duty, NMAC again mischaracterizes SAG's contention. NMAC argues it had no duty to "to disclose how it intended to respond to [SAG's] possible future requests for additional funding or its potential future breaches of contract." But SAG asserted NMAC had a duty to disclose Lambert's *decision not to honor his promise of continued funding*. Again, the existence

20

of that duty depended on proof of Lambert's oral promises to Kahn.  If SAG failed to establish the element of duty, the *Riverisland* error is to blame.

Finally, NMAC argues SAG failed to offer evidence it detrimentally relied on Lambert's purported oral promise.  NMAC argues that SAG's only claim of detriment is that Kahn had insufficient time to sell his assets to cure the "hard SOT" that NMAC declared on February 11, 2009.  NMAC contends Kahn had been trying to sell his assets unsuccessfully for six months, so there was no substantial evidence he could have sold the assets needed to prevent the hard SOT had he known as of *January 5* that NMAC intended to no longer tolerate SOT's.  But this argument, again, ignores SAG's actual contention and its evidence.

In addition to suffering harm as a result of NMAC's sudden imposition of an impossible 24-hour deadline to cure the SOT, SAG contended that Lambert's promise of continued funding induced Kahn to give NMAC substantial additional collateral, personal guaranties, and money, as well as to take on more debt to complete the new Oakland Toyota store — a dealership he would lose to NMAC six days after its opening — all to SAG's detriment.  This evidence easily established the element of detrimental reliance.

### b. *Nonsuit as to The ADDCA Claim*

SAG sued NMAC for violating the statutory protections afforded to car dealers under the ADDCA.  The ADDCA permits a dealer to sue for damages it suffers "by reason of the failure of [an] automobile manufacturer . . . to act in good faith in . . . terminating, canceling, or not renewing the franchise with said dealer."  (15 U.S.C. § 1222.)  At trial, SAG made the case that NMAC acted in bad faith by implementing a secret plan to squeeze Kahn for additional cash and collateral before surprising him with a declaration of default, an impossible demand for payment, and the termination of financing, all based on the sort of temporarily large SOT that NMAC had tolerated for months.

21

NMAC contends the trial court properly nonsuited SAG on this claim because the evidence it offered of NMAC's purportedly unfair conduct did not meet the "specialized" standard for "lack of good faith" under the ADDCA. NMAC argues that an automobile dealer "'cannot establish lack of good faith merely by demonstrating that the manufacturer acted arbitrarily, unreasonably, or in a generally unfair manner; rather, the dealer must establish that the manufacturer's conduct constituted "coercion, intimidation, or threats of coercion or intimidation" directed at the dealer.'"

NMAC argues, essentially, evidence it acted "arbitrarily or unreasonably or in a generally unfair manner" is insufficient to establish lack of good faith under the ADDCA. Instead, SAG was required to prove NMAC had "an ulterior motive" or an improper purpose when it abruptly enforced the 2-day/10-day rule and declared a hard SOT, leading to the freeze of financing for the Dealerships. NMAC contends SAG proved no such improper purpose in NMAC's conduct.

SAG contends, to the contrary, that it did offer proof NMAC acted with an improper purpose in concealing its intent to abruptly enforce the 2-day/10-day rule. That improper purpose was to obtain from Kahn all the cash and collateral it could, using trickery (Lambert's false promise of continued funding and no enforcement of the payment rule) to do so.

A jury certainly could have found lack of good faith, within the meaning of the ADDCA, from the evidence proffered by SAG. Moreover, as in regard to the concealment claim, the exclusion of SAG's parol evidence curtailed its ability to present all its evidence of violation of the ADDCA. Consequently, the nonsuit was erroneous and must be reversed.

## DISPOSITION

The judgment is reversed in part as to the claims against NMAC in the cross-complaint for negligent misrepresentation, intentional misrepresentation, promissory fraud, fraudulent concealment, and violation of the ADDCA, and the case is

22

remanded for retrial of those claims only.  In all other respects, the judgment is affirmed. SAG is entitled to costs on appeal.


                                                      THOMPSON, J.

WE CONCUR:


MOORE, ACTING P. J.


ARONSON, J.